# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In re: River Valley School District | : |
| | : |
| Appeal of: Beverly Caranese, Jessica | : |
| Clawson, Melanie Pantalone, Nathan | : No. 136 C.D. 2023 |
| Baird, Douglas Cull, Gwendolyn Cerra, | : Argued: February 7, 2024 |
| Christa Watt, Cindy Cribbs and Deanna | : |
| Fink | : |

**BEFORE:** HONORABLE RENÉE COHN JUBELIRER, President Judge[1]
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE MATTHEW S. WOLF, Judge

<u>**OPINION ANNOUNCING THE JUDGMENT OF THE COURT**</u>[2]

**BY PRESIDENT JUDGE COHN JUBELIRER**      **FILED: December 17, 2024**

## I. INTRODUCTION

"[T]he right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which is "the supreme Law of the Land," U.S. CONST. art. VI, cl. 2, "guarantees the opportunity for equal participation by all voters[,]" *Reynolds*, 377 U.S. at 566. "The conception of political equality from the Declaration of Independence, to Lincoln's

---

[1] This matter was reassigned to this author on February 22, 2024.

[2] No opinion received a majority of the votes. Thus, the Order of the Court of Common Pleas of Indiana County is affirmed. *See Sprague v. Cortes*, 150 A.3d 17, 21 (Pa. 2016) (indicating that when "the moving party fail[s] to convince a majority of the Court to take affirmative action . . . the Court in this circumstance cannot grant relief, relief is denied by operation of law, and the status quo is maintained").

Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments[, U.S. CONST. amends. XV, XVII, XIX], can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). This protection extends to "qualified voter[s] in a local election[,]" who "ha[ve] a constitutional right to have [their] vote counted with substantially the same weight as any other voter[.]" *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 53 (1970) (citation omitted). And while mathematical precision is not required and legitimate state policies may justify some level of deviation from equality, *Abate v. Mundt*, 403 U.S. 182, 185 (1971); *Holt v. 2011 Legislative Reapportionment Commission*, 38 A.3d 711, 741-42 (Pa. 2012), "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . [,]" *Reynolds*, 377 U.S. at 579.

Among the issues in this case is whether the one person, one vote principle is fulfilled for residents of River Valley School District (District) voting for school board (Board) directors based on the District's existing apportionment plan (Status Quo Plan) that includes three regions, each of which elects three directors, but are admittedly disproportionate in terms of population. Stated another way, the weight of one vote depends upon the region in which the voter resides, with those living in one of the two less populous regions having greater weight and those living in the most populous region having lesser weight. To cure this disproportionate impact, the District proposed two new reapportionment plans: one still based upon regions that have been redrawn to more fully equalize population (Modified Regional Plan); and one in which directors are elected at large notwithstanding where they live (At-Large Plan). The Court of Common Pleas of Indiana County (common pleas), cognizant of the long history of differing factions in the District, ultimately

2

determined the Status Quo Plan was unconstitutional, that the Modified Regional Plan did not violate the requirements of Section 303(b)(3) of the Public School Code of 1949[3] (School Code), and that, as between the valid, constitutional options, the Modified Regional Plan better suited the District's needs than the At-Large Plan.

On appeal, Appellants[4] argue common pleas' determinations are in error and the Court should reverse and direct the continued use of the Status Quo Plan. They further argue the Modified Regional Plan violates Section 303(b)(3) of the School Code because it splits election districts. After careful review and consistent with our "duty to avoid constitutional difficulties, if possible, by construing statutes in a constitutional manner[,]" *Commonwealth v. Ludwig*, 874 A.2d 623, 628 (Pa. 2005), and the principle that "the overriding objective [in redistricting] must be **substantial equality** of population among the various districts," *Reynolds*, 377 U.S. at 579 (emphasis added), we affirm.

## II. BACKGROUND

### A. *The District and the Historic Election of the Board*

The District, comprised of seven municipalities[5] located in Indiana and Westmoreland Counties, was formed in 1964 when the Blairsville and Saltsburg schools merged to create what was then called the Blairsville Saltsburg School

---

[3] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 3-303(b)(3). This section relevantly provides: "The boundaries of the regions shall be fixed and established in such manner that the population of each region shall be as nearly as equal as possible and shall be compatible with the boundaries of election district." *Id.* "The term election district refers to the polling place unit or precinct." *In re Pet. to Realign Reg'l Election Dists. in Pennsbury Sch. Dist.*, 79 A.3d 1218, 1220 n.2 (Pa. Cmwlth. 2013).

[4] Appellants are Beverly Caranese, Jessica Clawson, Melanie Pantalone, Nathan Baird, Douglas Cull, Gwendolyn Cerra, Christa Watt, Cindy Cribbs, and Deanna Fink.

[5] These municipalities are: Blacklick Township, Blairsville Borough, Burrell Township, Conemaugh Township, Loyalhanna Township, Saltsburg Borough, and part of Young Township.

District. (Petition Seeking Approval of Redistricting of Election Districts Pursuant to 24 P.S. § 3-303 (Redistricting Petition) ¶¶ 2, 4.) The District is a multi-county school district that elects its Board of Directors by region; the municipalities or election districts are grouped into three regions using census data. (*Id.* ¶¶ 7-8.) Section 303(b) of the School Code and Section 502 of the Pennsylvania Election Code (Election Code) provide the applicable regulatory authority.[6] (*Id.* ¶ 22.)

When first created, the District's voters elected directors by region in recognition of the District's merging but different communities and desire to ensure that smaller communities retain a voice on the school board. *McGinnis v. Blairsville Saltsburg Sch. Dist.* (C.C.P. Indiana, Dkt. No. 51889 C.D. 2006, filed Nov. 6, 2006) (*McGinnis I*), slip op. at 7[7]; *McGinnis v. Blairsville Saltsburg Sch. Dist.* (C.C.P. Indiana, Dkt. No. 51889 C.D. 2006, filed Jan. 3, 2007) (*McGinnis II*), slip op. at 7-9.[8] Under the original plan, there were three regions, and each region elected three directors.

Over time, however, voting inequality between the different regions arose. In 2006, common pleas set aside the District's then-existing regional plan concluding it violated federal constitutional law and Section 303(b)(3) because it did not comply with the population equality requirements. *See McGinnis I.* Four plans were submitted, including an at-large plan, a status quo plan, and a modified plan that redrew the regions' boundaries by shifting two election districts, thereby reducing

---

[6] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2702.

[7] *McGinnis I* is found at pages 77 to 86 of the Reproduced Record. We note that the Reproduced Record filed does not comport with Pennsylvania Rule of Appellate Procedure 2173, Pa.R.A.P. 2173, requiring that the pagination of reproduced records be in the form of an Arabic number followed by a small "a." For ease, the Court will utilize the method used in the Reproduced Record.

[8] *McGinnis II* is found at pages 88 to 98 of the Reproduced Record.

4

the inequalities.[9] *See McGinnis II*, slip op. at 4. The court rejected the status quo plan for the reasons set forth in *McGinnis I* and found the modified plan preferable to the at-large plan, both of which complied with federal law and Section 303(b). Common pleas reasoned the modified plan was preferable due to "the reality of **deep community divisions** within the [] District" and the potential "possibility that **smaller communities** . . . might be **outvoted** and end up with **no Board representation** at all." *McGinnis II*, slip op. at 8-9 (emphasis added). The modified plan approved by common pleas in *McGinnis II* is the Status Quo Plan Appellants now seek to retain. It rearranged election districts between the three regions to improve equality and included two split election districts.[10]

The *McGinnis* litigation has not been the only discord within the District. In 2021, the Board resolved to reconfigure its middle and high schools from separate campuses into a single campus located in Blairsville Borough. Based on the merger and unified campus, the Board passed a resolution on May 19, 2021, to change the name from "Blairsville[ ]Saltsburg School District" to "River Valley School District." These decisions gave rise to disagreement and litigation by those who supported maintaining separate campuses.[11] That ongoing community division is reflected in the present matter,[12] as Appellants are aligned more with the smaller

---

[9] A duplicate of the proposed modified plan was the fourth plan presented.

[10] The split election districts were located in Indiana County, specifically in Blacklick Township and Young Township.

[11] In *Save Our Saltsburg Schools v. River Valley School District*, 285 A.3d 692 (Pa. Cmwlth. 2022), an advocacy group filed a complaint in common pleas challenging the procedure used by the District in deciding to close the Saltsburg middle and high school, claiming it violated due process. This Court upheld common pleas' order sustaining the District's demurrers and dismissing the complaint.

[12] The parties here filed a Joint Statement describing the relationship between Blairsville and Saltsburg Boroughs as follows:

**(Footnote continued on next page…)**

5

communities, like Saltsburg Borough, than with Blairsville Borough, which is the largest municipality in the District. That division, and recognition of the differing communities of interest, are also the bases for the District's desire to retain a regional voting plan if possible.

## B. The Current Dispute

After the Status Quo Plan was approved, the populations between the District's three regions again changed over time, resulting in the Status Quo Plan having a 28% deviation in electoral representation. In the Redistricting Petition filed with common pleas, the District asserted that the Status Quo Plan, which uses 2000 census data, resulted in Region I, which contains Blairsville Borough, having a population of 5,024, Region II having a population of 3,831, and Region III, which contains Saltsburg Borough, having a population of 3,895.[13] (Redistricting Petition ¶ 7.) Using these values, the District maintained that, proportionally, each Region I Board Member represented 1,674 people, each Region II Board Member represented 1,277 people, and each Region III Board Member represented 1,298 people. (*Id.*

---

Residents of both communities are united by a mutual concern for the welfare of the [] [D]istrict and its students, but the communities have historically had conflicts related to the [] [D]istrict on issues including, but not limited to, building repair, curriculum, staffing, transportation of students, building locations, funding related to athletics and extracurricular activities, and the recent school district reconfiguration and Saltsburg campus closures. These community divisions related to the [] [D]istrict have led to litigation between community members and the [] [D]istrict. The deep community divisions on issues related to the [] [D]istrict are both historical and present today.

(Reproduced Record (R.R.) at 214.)

[13] Region I consists of all of Blairsville Borough and precinct 2 of Burrell Township; Region II consists of precinct 1 of Burrell Township, Blacklick Township, and precinct 2 of Conemaugh Township; and Region III consists of precincts 1 and 3 of Conemaugh Township, all of Saltsburg Borough, precincts 1 and 2 of Loyalhanna Township, and part of precinct 3 of Young Township. A map of the Status Quo Plan's regions is found at page 20 of the Reproduced Record.

6

¶ 10.) Under the 2020 census numbers, the mean region population is 4,250, with the total population of Region I, the most populous of the 3, deviating from the mean by 774 people (18.21%), and the deviation between Region I and Region II (the least populous) was around 28.07%.[14] (*Id.* ¶¶ 11-12.) Based on these numbers, the District believed the Status Quo Plan no longer met the population requirements of federal law and Section 303(b) of the School Code, as deviations of greater than 10% had been found by this Court to be violative of the Equal Protection Clause. (*Id.* ¶ 13 (citing *In re Pet. to Realign Reg'l Election Dists. in Pennsbury Sch. Dist.*, 79 A.3d 1218, 1224-25 (Pa. Cmwlth. 2013) (*Pennsbury*)).)

The District hired the DT Firm (DT) to evaluate and suggest reapportionment options to address the population inequities, and those options were presented to the Board in April 2022. (*Id.* ¶¶ 15-16.) The Board thereafter authorized the filing of the Redistricting Petition, seeking court approval of the Modified Regional Plan, which would reduce the population deviation by splitting two additional election districts, or, alternatively, the implementation of the At-Large Plan, which eliminates the regions entirely. (*Id.* ¶ 17.) The District preferred the Modified Regional Plan, which rearranged the municipalities/election districts (or parts thereof) so that Region I would have a population of 4,227, Region II would have a population of

---

[14] "Maximum population deviation is the sum of the percentage deviations from perfect population and the most- and least-populated districts." *Evenwel v. Abbott*, 578 U.S. 54, 60 n.2 (2016). Region II, the least populated region, had 419 fewer people than the mean, resulting in a deviation of 9.86%. Although the District states that this deviation is 18.19%, (R.R. at 6), it appears that the deviation between Region I (most populous) and the mean is 18.21% and between Region II (least populous) and the mean is 9.86%. When those deviations are added together, the maximum population deviation in the Status Quo Plan is 28.07%.

4,281, and Region III would have a population of 4,242.[15]  (*Id.* ¶ 20.)  Under this plan, the largest deviation from the mean would be 0.72%.[16]  (*Id.* ¶ 21.)

Appellants intervened and filed a Petition in Support of the Current District Status Quo Plan (Status Quo Petition).  (R.R. at 34-40.)  Therein, Appellants asserted that the Status Quo Plan had been approved by common pleas in *McGinnis II* over an at-large plan because the latter created the possibility that smaller communities would be outvoted and be without representation on the Board, concerns that remained viable.  (Status Quo Petition ¶¶ 12, 15-21.)  Appellants acknowledged that the deviation from the mean for Region I was 18.21%.  (*Id.* ¶ 23.)  They asserted that keeping the Status Quo Plan would meet the standards required by Section 303(b) of the School Code because it prevented splitting additional election districts, maintained contiguous regions, and would be as nearly equal as possible because no other regional configuration would satisfy the first two requirements.  (*Id.* ¶¶ 23-24, 26.)  This, Appellants argued, provided a rational basis for maintaining the current plan making the deviation from the equal population principle constitutional.

## C. Proceedings Before Common Pleas

Common pleas held a hearing on the petitions.  The District did not dispute that the Modified Regional Plan would split two election districts, Burrell 2 and Conemaugh 2, but asserted that any disruption "would be minimal, if not

---

[15] Under the Modified Regional Plan, Region I would consist of precinct 2 of Blairsville Borough, and precinct 1 and part of precinct 2 of Burrell Township; Region II would consist of precinct 1 of Blacklick Township, precincts 1 and 3 of Blairsville Borough, part of precinct 2 of Burrell Township, and part of precinct 2 of Conemaugh Township; Region III would consist of precincts 1, 3, and part of precinct 2 of Conemaugh Township, Saltsburg Borough, precincts 1 and 2 of Loyalhanna Township, and precinct 3 of Young Township.  A map of the Modified Regional Plan is found at page 26 of the Reproduced Record.

[16] Under the Modified Regional Plan, the maximum population deviation would be 1.23%.

8

nonexistent[.]" (R.R. at 107.) The District asserted that its circumstances of having only seven municipalities and being a multi-county district, which required contiguous regions under Section 502 of the Election Code, limited the configurations available to resolve population inequality issues. (*Id.* at 107-08.) It maintained that common pleas had the authority under Section 502 to split the election districts and that doing so would result in almost complete equality of the three regions. (*Id.* at 108.) According to the District, the deviation here was greater than the 18% at issue in the *McGinnis* litigation. The District further argued that, if the Modified Regional Plan could not be adopted, there was merit in the At-Large Plan in that it would ensure equality in the voting and end factionalism on the Board. (*Id.* at 110-11.)

Appellants argued the Status Quo Plan's current configuration reached the greatest equality possible while not splitting election districts in contravention of Section 303(b). (*Id.* at 113-14.) They disagreed that common pleas could split election districts under these circumstances and challenged the idea that the At-Large Plan was suitable for these communities. (*Id.* at 117-18.) Appellants maintained that the deviation at issue in *McGinnis* was close to 43%, not the 18% argued by the District, and that the deviation here was 28%. (*Id.* at 113.)

The parties submitted a Joint Stipulation of Facts. (*Id.* at 212-14.) They also agreed to have common pleas take judicial notice of the case file in the *McGinnis* litigation. (*Id.* at 205-06.) In addition, the District and Appellants offered expert testimony supportive of their positions.

The District introduced the testimony of DT's David Wassel, who described the suggested redistricting plans. He also described the geographic difficulties related to the voting precincts for Blairsville Borough, which is completely

9

surrounded by Burrell 2, and the need to add these two precincts together to get the most equal population. (*Id.* at 132-34.) Wassel indicated the deviation between Region I and Region II currently exceeds 28%, the Status Quo Plan is not equitable, and the Status Quo Plan would become more inequitable under population projections. (*Id.* at 134-35, 147-49.) Appellants asserted a relevancy objection to Wassel's population projections, which common pleas overruled. (*Id.* at 146.) Wassel testified it was not possible to get a more equal regional plan without splitting election districts and observed **there were already some split districts** in Indiana County, particularly in one community in Blacklick Township and Young Township, in which one precinct covers two different school districts resulting in some precinct voters voting for one district's school board and others to vote for the other district's school board. (*Id.* at 139-40.) Wassel explained how the elections were run in those split districts without issue. Wassel also testified that the At-Large Plan was better than the Status Quo Plan because it ensured voter equality. (*Id.* at 143-44.) On cross-examination, Appellants questioned Wassel about his population projections, pointing out that his assumptions were not consistent with how the population actually changed between 2010 and 2020. (*Id.* at 151-57.)

Appellants presented the testimony of Rohan Lambore as an expert in voter mapping to counter Wassel's opinions. Lambore opined the Status Quo Plan satisfied all of the requirements of both the School Code and the Election Code, including that it created districts that were nearly as equal as possible. (*Id.* at 178-80.) He also testified the At-Large Plan did not serve the best interests of the District because it did not take into consideration the specific community's interests, values, and needs, and resulted in those **communities' disenfranchisement**. (*Id.* at 182, 184.) In particular, Lambore referenced the history of contention between

10

Blairsville and Saltsburg Boroughs. (*Id.* at 184-85.) Lambore disagreed with Wassel's population projections. (*Id.* at 185-86.) On cross-examination, Lambore acknowledged having spoken only to Appellants' counsel and Saltsburg Borough residents and not to any residents from the other communities to determine what their interests or opinions would be. (*Id.* at 190-92.) He agreed that, if the Modified Regional Plan did not split election districts, the modified plan's numbers were preferrable to the Status Quo Plan. (*Id.* at 194.)

*D. Common Pleas' Decision*

Common pleas issued its Order and supporting opinion on January 27, 2023, holding that the Status Quo Plan was unconstitutional, that the Modified Regional Plan was valid under common pleas' interpretation of Section 303(b)(3), and that, as between the valid, constitutional options, the Modified Regional Plan better suited the District's needs than the At-Large Plan. Common pleas explained that for a regional plan to be valid, it had to meet the following criteria: (1) the population of each region should be as nearly equal as possible; (2) the regions should be compatible with the boundaries of each election district; and (3) each region should be contiguous. (Opinion (Op.) at 5 (citing Section 303(b)(3) of the School Code, and Section 502 of the Election Code).[17]) It examined both regional plans under the first two requirements, related to Section 303(b) of the School Code. Common pleas concluded the **Status Quo Plan violated the population equality requirements** and the "one person, one vote principle" of federal law, as it reflected deviations from the mean of greater than 18% and deviations between the most (Region I) and least populous region (Region II) of 28%. (*Id.* at 6-8 (citing *Pennsbury*, 79 A.3d 1218; *Delozier v. Tyrone Sch. Dist.*, 247 F. Supp. 30 (W.D. Pa. 1965)).) Although

_____

[17] Common pleas' opinion is appended to Appellants' brief.

11

common pleas did not accept Wassel's population growth projections in their entirety, it did conclude there was some weight in those opinions that supported finding that the Status Quo Plan could not be maintained.

Common pleas then considered the validity of the Modified Regional Plan. The Modified Regional Plan, common pleas found, "significantly reduce[d] the deviations and satisfie[d] the requirement that the population in the regions be as nearly as equal as possible" of Section 303(b) and the contiguity requirement of Section 502. (*Id.* at 8.) The Modified Regional Plan, common pleas explained, though, splits two election districts, and in *In re Chichester School District*, 234 A.2d 187, 190 (Pa. Super. 1967) (*Chichester I*), the Superior Court stated that when it is impossible to maintain election district boundaries and form regions that satisfy equal population, Section 303(b)(3)'s boundaries' provision prevailed over the equality provision. (*Id.* at 7.) However, in examining Section 303(b)(3)'s language, common pleas reasoned that the statute did not require that regions be "consistent" with or "follow the boundary lines of election districts," but that the regions be "**compatible**" with those boundaries. (*Id.* at 9.) Looking to the common and approved usage of "compatible," as set forth in dictionary definitions, common pleas concluded that the General Assembly intended the regions to be "capable of existing together in harmony" or "to exist or occur together without conflict." (*Id.* at 9-10.) Based on the evidence presented, common pleas found that while, ordinarily, this meant a comparison of the proposed regional boundaries and election district boundary lines, in unique situations, a broader reading of compatibility should be made. Noting the difficulties relating to the configuring of election districts in this multi-county school district, common pleas explained that Blairsville Borough is completely surrounded by precinct 2 of Burrell Township and the two together

12

constituted the most densely populated area of the District. Furthermore, common pleas held, Indiana County was unique in that it **already had split two election districts** in Blacklick and Young Townships, for the purpose of voting for school board members under the existing Status Quo Plan. Common pleas reasoned that the system used in **those split districts**, which "permit[ted] electors, without conflict or disruption, that vote in the same precinct to vote for school directors in different school districts based on the exact location of their residence[,]" could **easily** be used to implement the Modified Regional Plan to make it "compatible" with the election district boundaries and current precincts. (*Id.* at 10.) Therefore, the court held the Modified Regional Plan was **not inconsistent** with Section 303(b) and a valid regional plan.

In addition, common pleas held it had the authority to create new election districts under Section 502 of the Election Code.[18] Accordingly, if necessary, common pleas "split" the election districts in accordance with the Modified Regional Plan. (*Id.* at 10-11.) When this occurred, common pleas held, the Modified Regional Plan met all of the statutory requirements. (*Id.* at 11.)

Common pleas then compared the Modified Regional Plan and the alternative At-Large Plan to determine which would best meet the District's needs, and

___

[18] Section 502, titled "Court to create new election districts," also provides that

the court of common pleas of the county in which the same are located, may form or create new election districts by dividing or redividing any . . . election district into two or more election districts of compact and contiguous territory, . . .wholly contained within any larger district from which any . . . school district officers are elected, or alter the bounds of any election district, or form an election district out of two or more adjacent districts or parts of districts, or consolidate adjoining election districts or form an election district out of two or more adjacent wards, so as to suit the convenience of the electors and to promote the public interests.

25 P.S. § 2702.

13

concluded the Modified Regional Plan was better suited. It also observed that the District had provided compelling arguments that adopting the At-Large Plan would mitigate conflict over the population equality issues and require all candidates to campaign through the entire District, rather than a single region. (*Id.* at 12-13.) As between the Status Quo Plan, should it be determined to be constitutional, and the At-Large Plan, common pleas concluded the At-Large Plan better served the District's needs and would approve that plan over the Status Quo Plan. (*Id.* at 14.)

Appellants filed an appeal and, at common pleas' direction, a Concise Statement of Errors Complained of on Appeal in accordance with Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b). Therein, Appellants challenged all of common pleas' determinations, as well as the court's reliance on Wassel's testimony. In response, common pleas issued an order adopting, for purposes of Rule 1925(a), its prior opinion. Following briefing and oral argument before an en banc panel of this Court, this appeal is ready for disposition.[19]

## III.    DISCUSSION

Appellants argue[20] common pleas misinterpreted Section 303(b)(3) of the School Code and Section 502 of the Election Code, and related precedent, and should not have relied on Wassel's testimony to find the Status Quo Plan invalid and the Modified Regional Plan valid. They further challenge common pleas' decision adopting, in the alternative, the At-Large Plan over the Status Quo Plan as being better for the District's interests.

---

[19] "Our review in an appeal from an approval of a school district reapportionment plan is limited to determining whether the trial court abused its discretion or committed an error of law and whether its decision is supported by substantial evidence." *Pennsbury*, 79 A.3d at 1224.

[20] We have reordered Appellants' arguments for ease of discussion.

*A. Whether Common Pleas erred in relying on Wassel's testimony.*

We begin with Appellants' evidentiary challenge in which they contend common pleas erred in relying on Wassel's population projections to find the Status Quo Plan deficient, which they argue were purely speculative. The District argues that any objection based on the alleged speculative nature of that testimony was not preserved for appellate review under Pennsylvania Rule of Evidence 103(a), Pa.R.E. 103(a), because Appellants' objections were to the "relevance" of that testimony, not that it was speculative. In addition, the District observes that Wassel's population projections were not accepted in their entirety but were merely given some weight.

At the hearing, Appellants objected to that testimony as follows: "Judge, I'd like to place an objection on the record with respect to **relevance** on population projections with respect to determining the legality of any map." (R.R. at 146 (emphasis added).) Appellants now argue Wassel's testimony is inadmissible because it was speculative. However, Rule of Evidence 103(a)(1)(B) requires that to preserve an issue relating to the admission of evidence for appeal, the specific ground of the objection must be asserted in the record. Pa.R.E. 103(a)(1)(B).[21] That did not occur here – the specific objection was to relevance, not speculation. Moreover, while common pleas gave some weight to that testimony generally, it did not "accept the projections in their entirety," but held that Wassel's opinion regarding increasing equality disparities gave "weight to [common pleas'] opinion." (Op. at 7.) Determinations of evidentiary weight and credibility are for the

_____

[21] Specifically, Rule of Evidence 103(a)(1)(B) provides: "**(a) Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only: (1) if the ruling admits evidence, a party, on the record: . . . (B) states the specific ground, unless it was apparent from the context[.]" Pa.R.E. 103(a)(1)(B).

15

factfinder, which is common pleas here. *In re Swamp Rd. in Wayne Twp.*, 859 A.2d 528, 532 (Pa. Cmwlth. 2004); *McMenamin v. Tartaglione*, 590 A.2d 802, 811 (Pa. Cmwlth. 1991). Accordingly, this is not a reason to reverse common pleas' Order.

*B. Whether the Status Quo Plan violates the Equal Protection Clause and/or the equality provision of Section 303(b)(3).*

Common pleas concluded the Status Quo Plan violated the population equality requirements of Section 303(b)(3) and the "one person, one vote principle" because the maximum deviation between the most and least populated region in the District exceeded 28%. (*Id.* at 6-8 (citing *Pennsbury*, 79 A.3d 1218; *Delozier*, 247 F. Supp. 30).) Appellants argue this conclusion was erroneous because Section 303(b)(3) only requires that the populations be "nearly equal as possible" and not "absolute[ly]" equal. (Appellants' Brief (Br.) at 26.) Appellants contend that, on these facts, including the District's characteristics, the Status Quo Plan meets that requirement because it is the only regional plan that will satisfy the other requirements of Section 303(b)(3) and Section 502. (*Id.* at 27 (citing *In re Pet. to Reapportion the Sch. Dir. Regions of the Chichester Sch. Dist.*, 688 A.2d 1275, 1278 (Pa. Cmwlth. 1997) (*Chichester II*)).) According to Appellants, the greater population deviation found in the Status Quo Plan is "tolerable" and, therefore, constitutional, because it advances the rational governmental policy of maintaining election district boundaries and there is no evidence of arbitrariness or discrimination. (*Id.* at 27, 29-30 (citing *Pet. of the Bd. of Dirs. of Hazleton Area Sch. Dist.*, 524 A.2d 1083, 1086 (Pa. Cmwlth. 1987) (*Hazleton*); *In re Chichester Sch. Dist.*, 234 A.2d 187, 190 (Pa. Super. 1967) (*Chichester I*); *Spring-Ford Area Sch. Dist. Div. Case*, 234 A.2d 184 (Pa. Super. 1967)).)

16

The District maintains there was no error in finding that the Status Quo Plan violates the equality provision of Section 303(b)(3) and the Equal Protection Clause or in rejecting Appellants' argument that any amount of inequality is justifiable because a regional plan comports with the boundary compatibility provision. According to the District, Appellants' arguments ignore the one person, one vote principle that is fundamental under the Fourteenth Amendment and ask the Court to disregard that foundational principle. The District argues that when tested against longstanding legal principles regarding the tolerable limits of population inequality, the Status Quo Plan, reflecting deviation of greater than 28%, is invalid. (The District's Br. at 13-15.)

Upon review, we discern no error or abuse of discretion in common pleas' determination that the Status Quo Plan, with its deviation exceeding 28% deviation, violates the **fundamental** constitutional precept of one person, one vote. That conclusion is supported by the precedent of the United States Supreme Court and of this Court. Common pleas' decision gives precedence to the highest law of this land, the United States Constitution, and follows the principle that "the **overriding objective** [in redistricting] must be **substantial equality of population** among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . ." *Butcher v. Bloom*, 203 A.2d 556, 570 (Pa. 1964) (quoting *Reynolds*, 377 U.S. at 579) (emphasis added).

The Fourteenth Amendment to the United States Constitution mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. We have explained that the equal population requirement in Section 303(b)(3) of the School Code, which relevantly provides: "The boundaries of the regions shall be fixed and established in such manner that

17

**the population of each region shall be as nearly as equal as possible** and shall be compatible with the boundaries of election district," 24 P.S. § 3-303(b)(3) (emphasis added), relates to the one person, one vote principle of the Equal Protection Clause. *Pennsbury*, 79 A.3d at 1224.

The United States Supreme Court has issued innumerable decisions addressing the one person, one vote principle in the context of state and local apportionment matters. Therein, the high court's decisions reflect **limitations** to the idea, proffered by Appellants, that a legitimate state interest can render **any** level of deviation constitutionally permissible. Those decisions examined whether the state interest asserted as justification for the deviation was legally sufficient, which Appellants contend is the only relevant inquiry under Section 303(b)(3), **and** then **separately** examined whether there were **other reasons** that would render the population deviation a **violation of the Fourteenth Amendment**, notwithstanding the state's proffered justification These other reasons could be the existence of a built-in bias toward a particular voting district or a maximum deviation that went beyond the "limited" or "minor" deviation permitted under *Reynolds*.

As early as February 1967, the United States Supreme Court held that a total deviation of **26.48%** in state legislative districts was unconstitutional under the one person, one vote principle because no justification had been provided for the deviation. *Kilgarlin v. Hill*, 386 U.S. 120, 123 (1967) (per curiam). The high court further observed that, even if a state justification had been proffered, it was "**doubtful** . . . **that the deviations** evidence[d in that matter **were**] the kind of '**minor**' variations **which** . . . **might** be **justified** by **local policies** counseling the maintenance of political subdivisions in apportionment plans." *Id.* (emphasis added).

In 1970, the United States Supreme Court in *Hadley*, which examined the election of the board of trustees of a joint junior college by multiple school districts of various sizes, recognized that the "consistent theme" of the high court's jurisprudence on the one person, one vote principle was "that the right to vote in an election is protected by the United States Constitution against dilution or debasement." 397 U.S. at 54. The high court explained that "when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Id.* at 56. It cautioned, however, that reapportionment plans, including those established by state statute, could not contain "built-in discrimination against voters in large districts" or built-in bias in favor of voters in smaller districts, as that would not be "sufficient compliance with the constitutional mandate that each person's vote count as much as another's, as far as practicable." *Id.* at 57. Thus, apportionment plans that contain a built-in bias in favor of small voting districts do not comport with the constitutional mandate of the Fourteenth Amendment.

Shortly thereafter, in 1971, the United States Supreme Court applied its reasoning from *Hadley*, as well as examined the stated justification for a departure from equality, in *Abate*, where it examined whether an **11.9%** total deviation in local electoral districts violated the Fourteenth Amendment due to either a built-in bias or intolerable maximum deviation. Acknowledging that "**slightly** greater percentage deviations may be tolerable for local government apportionment schemes," a statement Appellants cite in their brief in support of their position, (Appellants' Br. at 29), the Court nevertheless cautioned that its decisions "ha[d] **never suggested** that **certain geographic areas** . . . are **entitled** to **disproportionate**

19

representation," *Abate*, 403 U.S. at 185 (emphasis added). Indeed, the Court "underscored the **danger of apportionment** structures that contain[ed] a built-in bias tending to favor particular geographic areas . . . or **which necessarily w[ould] tend to favor, for example, less populous districts over their more highly populated neighbors**." *Id.* at 185-86 (citing *Hadley*, 397 U.S. at 57-58) (emphasis added). Finding no such built-in bias in the reapportionment plan at issue in *Abate*, the Court turned to the stated reason for the departure from population equality, which it found longstanding and legitimate, and concluded that it was sufficient to justify the deviation from population equality at that time, although it **warned** that "[n]othing we say . . . should** be taken to **imply** that" the proffered reason "could **justify substantially greater deviations**." *Id.* at 186-87. Thus, the high court in *Abate* specifically cautioned that there were limits to the level of deviation that a legitimate state reason, even a longstanding one, could justify and remain within constitutional bounds.

That same year, the United States Supreme Court acknowledged in *Mahan v. Howell*, 410 U.S. 315, 326 (1971), the legitimacy of a state interest in preserving political subdivisions or maintaining contiguous and compact voting districts in a case involving the apportionment of state legislative districts. Having accepted this interest as legitimate, the Court **then separately** considered whether the maximum deviation of **16.4%** was within tolerable constitutional limits because "a [s]tate's policy urged in justification of disparity in district population, however rational, **cannot constitutionally be permitted to emasculate the goal of substantial equality**." *Mahan*, 410 U.S. at 325-26, 328 (emphasis added). Thus, only "**some** deviations from the equal-population principle are constitutionally permissible" when those "divergences . . . are based on legitimate considerations incident to the

20

effectuation of a rational state policy[.]" *Id.* at 325 (emphasis added). Reasoning that the "relatively minor variations present," 16.4%, in the apportionment plan in *Mahan* were "**substantially less than the percentage deviations** that ha[d] been found **invalid**," **including** plans with maximum **deviations** of **26%**, the Court concluded the plan "ha[d] not sacrificed substantial equality to justifiable deviations." *Id.* at 329 (citing, *e.g.*, *Kilgarlin*, 386 U.S. 120; *Swann v. Adams*, 385 U.S. 440 (1967)). While this **16%** deviation, the Court warned, "may well **approach tolerable limits**," it did not believe it exceeded them. *Id.*[22] As in *Abate*, the Court indicated, again, that legitimate state policies can only support a deviation to a point and once that point is reached, the deviation is no longer tolerable.

Consistent with these holdings of the highest court, this Court has also recognized limits to the use of Section 303(b)(3)'s election district integrity provision to, as Appellants do here, justify deviations from population equality. In *In re Establishment of Representation of Cameron County School Board by 9 Directors Elected at Large*, 456 A.2d 226 (Pa. Cmwlth. 1983) (*Cameron County*), the supporters of a regional apportionment plan that had a population disparity of four-to-one argued "that the integrity of the election districts must take priority over the population factor." *Cameron Cnty.*, 456 A.2d at 228 (quoting *Chichester I*, 234 A.2d at 190). While we "agree[d] with this general proposition," we nevertheless pointed out that the **disparity** amongst the regions in *Cameron County* **was significant**, **not minor**, and, therefore, the regional plan proposed was not acceptable. *Id.*

In *Hazleton*, this Court referenced, albeit briefly, the constitutional analysis of *Reynolds* and *Mahan* in its review of a regional school district reapportionment plan

---

[22] The United States Supreme Court continues to apply these standards in apportionment cases. *See Evenwel*, 578 U.S. at 59-61.

to determine if the deviation there, 16%, violated *Reynolds'* principles.[23] *Hazleton*, 524 A.2d at 1085. Acknowledging that a deviation of more than 10% was prima facie evidence of unconstitutionality, we nevertheless held that the deviation was constitutionally permissible, citing *Mahan*, based on the legitimate state interests of maintaining election district boundaries and contiguous voting regions. *Hazleton*, 524 A.2d at 1085-86. While calling these two interests "absolutes" that had to be complied with, we also indicated that **this could change if "compelling circumstances" warranted**. *Id.* at 1086. In other words, the Court recognized, effectively, that a different balance under Section 303(b)(3) might be warranted in certain circumstances.

Finally, this Court's more recent decision in *Pennsbury* reflects that review under both Section 303(b)(3) and the Fourteenth Amendment's Equal Protection Clause is required. 79 A.3d at 1224-27. We summarized the latter principle required

> that the districts by which representatives are elected be "of nearly equal population, so that each person's vote may be given **equal weight in the election of representatives**." *Voinovich v. Quilter*, 507 U.S. 146, 160-61 . . . (1993). This "one person, one vote" principle applies to school board elections. *Hadley* . . . , 397 U.S. [at] 53-56 . . . . Population **deviations under 10%**, however, **are** considered **minor** deviations from mathematical equality and **are insufficient by themselves** to make out a prima facie case of discrimination under the Equal Protection Clause. *Voinovich*, 507 U.S. at 161 . . . ; *Brown v. Thomson*, 462 U.S. 835, 842 . . . (1983); *In re Mun*[.] *Reapportionment of T*[*wp.*] *of Haverford*, 873 A.2d 821, 834 (Pa. Cmwlth. 2005) (en banc). Therefore, where the maximum population deviation in a state or local reapportionment plan is **under 10%**, the mere fact that greater mathematical perfection is possible is **not sufficient to establish a violation** of the Equal Protection Clause

---

[23] The Court's discussion of the federal equal protection principles was made "in the interests of judicial economy and in an attempt to provide guidance to the [school d]istrict and trial court" in that case, as the Court had reversed the trial court's order based on a lack of contiguity of the regions, as required by Section 502 of the Election Code. *Hazleton*, 524 A.2d at 1085.

**without proof of discriminatory conduct or a deliberate attempt to increase inequality**.

*Pennsbury*, 79 A.3d at 1224 (emphasis added).

We then examined whether total deviation of the proposed regional plan accepted by the court of common pleas was, as the appellants argued, violative of the Equal Protection Clause. Concluding that the total deviation at issue, **2.91%**, fell far below the 10% threshold and **was a "minor" deviation** that did not run afoul of the Fourteenth Amendment unless proof of discrimination or an attempt to increase inequality existed, which there was none, the Court turned to whether the regional plan was "as nearly as equal as possible" under Section 303(b). *Id.* We held that federal equal protection principles, including the existence of legitimate public policies that justified the deviation, applied in this inquiry, but cautioned that these policies could not "override high population disparities where significantly greater population equality is possible." *Id.* at 1227. But, where the deviations are small, we explained, the fact that another plan might be less disparate does not make the accepted plan invalid under Section 303(b)(3) if the deviations advance rational and legitimate policies. *Id.* When this was done in *Pennsbury*, we concluded the approved plan was not the result of arbitrariness or discrimination and "the slight population inequality," 2.91%, was supported by a legitimate justification, maintaining the continuity of the existing regions. *Id.* Thus, our analysis in *Pennsbury* was akin to that performed by the United States Supreme Court in *Mahan* and *Abate* in that we examined the amount of the deviation independently from other considerations.

From these cases, we discern that the inquiry into the validity of a reapportionment plan requires the consideration of whether the proposed deviation in population equality would be tolerable under the Fourteenth Amendment **and**

23

whether that plan comports with Section 303(b)(3).  The first requires ascertaining what the deviation in population equality would be and if the justification for that deviation, if provided, is sufficient to survive constitutional scrutiny.  *See, e.g.*, *Mahan*, 410 U.S. at 325-26; *Pennsbury*, 79 A.3d at 1224-25.  Deviations of less than 10%, absent evidence of arbitrariness or discrimination, are permissible. *See, e.g.*, *Voinovich*, 507 U.S. at 161; *Pennsbury*, 79 A.3d at 1224-25.  However, deviations that exceed 10% are prima facie unconstitutional and may be permissible only if justified by a strong, legitimate state interest.  *See, e.g.*, *Mahan*, 410 U.S. at 325-26; *In re Pet. to Change Representation Plan of Octorara Area Sch. Dist.*, 722 A.2d 767, 771 (Pa. Cmwlth. 1999) (*Octorara*).  And even if a state interest is proffered and is legitimate, **if the deviation is substantial** or **not "slight,"** or "limited," or if the plan reflects a built-in bias that favors a less populous area, **the deviations are not constitutionally tolerable**.  *See, e.g.*, *Mahan*, 410 U.S. at 325-26; *Abate*, 403 U.S. at 185-86; *Hadley*, 397 U.S. at 56-57.  This is the analysis performed by the United States Supreme Court in *Mahan*, *Abate*, and *Hadley*.  And this Court followed this analytical framework in *Pennsbury* and, essentially, in *Cameron County*.  If the deviation is "tolerable" under the federal constitution, then a regional reapportionment plan must also be tested against the requirements of Section 303(b)(3).

Applying these principles here, we **cannot** reasonably **say** that common pleas erred in finding the Status Quo Plan unconstitutional where the **admitted total deviation** was **over 28%**, which does not reflect the "**substantial equality** of population among the various districts" needed to satisfy the one person, one vote principle required by the Fourteenth Amendment.  *Butcher*, 203 A.2d at 570 (quoting *Reynolds*, 377 U.S. at 579) (emphasis added).  This is consistent with the holdings

24

of the United States Supreme Court, which have found that deviations of 26% violated the population equality requirements, *Kilgarlin*, 386 U.S. at 120; *Swann*, 385 U.S. at 443-44. This conclusion gives effect to the **supremacy** of our nation's foundational document and the holdings of our Country's highest court, as well as this Commonwealth's highest court, which have recognized that "the **overriding objective** [in redistricting] must be **substantial equality of population** among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . ." *Butcher*, 203 A.2d at 570 (quoting *Reynolds*, 377 U.S. at 579) (emphasis added). Ultimately, the one person, one vote requirement must be respected and cannot be treated as an afterthought because the United States Constitution is the supreme law of the land and may not be infringed upon by the States. U.S. CONST. art. VI, cl. 2.[24] Pursuant to the Supremacy Clause, "this Court, **like all state courts**, **is bound by the decisions of the U.S. Supreme Court with respect to the federal Constitution and federal substantive law**." *Commonwealth v. Jemison*, 98 A.3d 1254, 1257 (Pa. 2014) (emphasis added).

Appellants' contrary position, that as long as the proposed regional plan is the **only** plan possible without splitting election districts, such plan is "as equal as possible" for the purposes of Section 303(b)(3) and does not offend the Equal Protection Clause's one person, one vote requirement, is born out of the Superior

---

[24] Clause 2 of Article VI of the United States Constitution states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

25

Court's decisions in *Spring-Ford* and *Chichester I*. Based primarily on these cases and their progeny, Appellants essentially argue that the state's legitimate interest in maintaining election district boundaries takes **precedence** and **any inequality** derived from ensuring that state interest **is constitutionally tolerable**. However, accepting Appellants' position means, effectively, that, regardless of the Status Quo Plan's **admitted inequitable distribution** of **voters**, the Status Quo Plan is constitutional and the District is **required** to retain the Status Quo Plan, over any other regional voting plan. This position fails to comport with the precedent of the federal courts and the more recent precedent in this Commonwealth addressing the one person, one vote principle and constitutional guarantees of the Fourteenth Amendment, as discussed above. Moreover, when *Spring-Ford* and *Chichester I* are examined more closely, they, respectively, either did not address or did not fully address the constitutional issue in a manner consistent with United States Supreme Court precedent, raising questions as to their applicability or validity.

In *Spring-Ford*, the Superior Court, in 1967, explained the one person, one vote principle was applicable to "elective bodies lower than state legislatures," and, for the purposes of determining initial compliance with Section 303(b)(3), the proposed regional plan had to have boundaries that were compatible with those of the election districts and had to be as nearly as equal as possible. 234 A.2d at 186-87. The court further held that, in determining this initial compliance, it was the present population that must be considered, not future trends in the population. *Id.* at 187. While *Spring-Ford* announced important principles relating to Section 303(b)(3) and the one person, one vote mandate, it, importantly, **did not analyze whether the population deviation at issue was constitutional**, raising a question as to whether that case offers guidance on the constitutional issue at present.

26

On the same day as *Spring-Ford*, the Superior Court decided *Chichester I*, in which the court reiterated *Spring-Ford*'s holding as to what could be considered under Section 303(b)(3) and turned to the question of whether the population deviation there, approximately two-to-one, was constitutionally tolerable. The court acknowledged that, in some instances, there could be a conflict between the boundary compatibility provision and the equality provision and that, in such instances, the former provision prevailed, citing the legislature's use of the word "shall" for that provision and the legislature's use of "only . . . as nearly **as possible**," in relation to the population equality provision. *Chichester I*, 234 A.2d at 190 (emphasis added). The *Chichester I* Court reasoned this deviation was permissible because there was no evidence of taint of arbitrariness or discrimination and "[i]t was just not possible to establish . . . regions which were compatible with the existing election district[s] and come any closer to equality in population." *Id.* at 191. It is this language in *Chichester I* that Appellants rely upon to support their position that the Status Quo Plan is constitutional **regardless** of the 28% population deviation.

A closer examination of *Chichester I*, and its abbreviated analysis, however, raises questions as to the soundness of its holding, at least as to federal constitutional principles. For example, the *Chichester I* Court quoted our Supreme Court's decision in *Butcher*, for the proposition that there is no constitutional violation when "[t]here has been a faithful adherence to a plan of population-based representation, with **such <u>minor</u> deviations only as may occur** in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Chichester I*, 234 A.2d at 190-91 (quoting *Butcher*, 203 A.2d at 572) (emphasis added). But **nowhere** in the *Chichester I* decision did the court examine whether the two-to-one deviation at issue was a "minor deviation." *Id.* Instead, it focused, as its sole concern, on the

27

"integrity of the election districts," and the legislature's use of the word "shall" for that provision. *Id.* at 190 (emphasis added). In doing so, the *Chichester I* Court gave its imprimatur to the legislature's apparent subjugation of the federal constitutional mandate to a state interest in maintaining the "integrity of the election districts," without regard to the level of deviation resulting therefrom. This would appear contrary to *Butcher*'s **conditioned** approval of "minor deviations" where such deviations "are free from any taint of arbitrariness or discrimination." *Butcher*, 203 A.2d at 572. Moreover, when *Chichester I* is read against the United States Supreme Court and Pennsylvania court decisions addressing the parameters of the one person, one vote principle discussed above, the support it lends to Appellants' position is diminished, as is the soundness of its holding.

Appellants' arguments and reliance on *Chichester I*, which suggest that Section 303(b)(3)'s provisions are the **only** relevant inquiry and that **any** level of deviation is constitutionally tolerable if there is no other way to meet the compatibility requirement, subjugates the federal constitutional rights of qualified voters to "have [their] vote counted with substantially the same weight as that of any other voter[.]" *Hadley*, 397 U.S. at 53. Maintaining the Status Quo Plan due to a need to comply with Section 303(b)(3)'s compatibility requirement incorporates a built-in **bias** in favor of Appellants and others in the less populated regions, which cannot "be sustained as a sufficient compliance with the constitutional mandate that each person's vote counts as much as another's, as far as practicable." *Id.* at 57. As the high court underscored in *Abate*, there is **constitutional danger** in an "apportionment structure that contain[s] a built-in bias tending to favor particular geographic areas or . . . which necessarily **will tend to favor, for example, less populous districts over their more highly populated neighbors**." 403 U.S. at

28

185-86 (emphasis added). Here, Appellants' reading of Section 303(b)(3) and *Chichester I* as permitting **any level** of deviation as long as there is no other regional plan that would not split election districts, has all but ensured that the **less populous** Regions II and III will retain **favorable treatment** as to the weight of their votes and **overrepresentation** on the Board. This cannot "be sustained as a sufficient compliance with the constitutional mandate that each person's vote counts as much as another's, as far as practicable." *Hadley*, 397 U.S. at 57. Accordingly, neither *Spring-Ford* nor *Chichester I*, require that we find that common pleas erred in holding that the Status Quo Plan violates the one person, one vote principle guaranteed by the Fourteenth Amendment.[25]

---

[25] Judge Fizzano Cannon's dissent rejects common pleas' conclusion that the Status Quo Plan does not meet the "as equal as possible" requirement of the School Code because common pleas did not consider whether the deviation was arbitrary or discriminatory, citing *Octorara*. *In re River Valley Sch. Dist.*, __ A.3d __, __ (Pa. Cmwlth., No. 136 C.D. 2023, filed December 17, 2024) (Fizzano Cannon, J., concurring and dissenting), slip op. at 19-21. This dissent bases part of its conclusion that common pleas erred on the dissent's position that the Modified Regional Plan did not comply with the School Code and its belief that there was no evidence presented of another plan that was more equal than the Status Quo Plan. Respectfully, however, the dissent **does not persuasively distinguish** the precedent from the United States Supreme Court, cited above, stating that, even if a state presents an acceptable justification for a population deviation, like maintaining existing boundaries, courts **must still inquire** into **whether those deviations exceed** the **constitutional limitations** of the Equal Protection Clause, *Mahan*, 410 U.S. at 328, and that "the overriding objective [in redistricting] must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . ," *Reynolds*, 377 U.S. at 579. The dissent's analysis, like Appellants' arguments, would allow **any amount of inequality** to exist on the basis of a regional plan being, basically, "as good as it can be" without splitting election districts. The dissent indicates that "it is simply not true that adhering to the School Code's precinct compatibility requirement could require a school district to accept unconstitutionally broad deviations in populations between regions." *In re River Valley*, __ A.3d at __ (Fizzano Cannon, J., concurring and dissenting), slip op. at 16. However, the dissent also suggests that the Status Quo Plan can be constitutional, notwithstanding its 28% deviation, and that it should be compared with the At-Large Plan, which could result in the District having to "accept [an] unconstitutionally broad deviation[]." *Id.* For the reasons set forth above, this **conflicts with** the precedent of the United States Supreme Court **(Footnote continued on next page…)**

29

*C. Whether the Modified Regional Plan complies with Section 303(b)(3) of the School Code.*

Common pleas held that the Modified Regional Plan complied with Section 303(b)(3) of the School Code because it satisfied the equality provision by "significantly reducing the deviations" between the regions and was not inconsistent with the election district compatibility provision. (Op. at 8-9.) In reaching the latter conclusion, common pleas examined the plain meaning based on the definition of compatibility, which, in that court's view, should be broadly read given the specific circumstances of the District, including the facts that split election districts already existed and were successfully administered, and, critically, the need for compliance with the constitutional requirement of voting equality.[26]

Appellants argue common pleas erred in approving the Modified Regional Plan because it split election districts by having regions that run through, rather than along, the boundaries of precinct 2 of Burrell Township and precinct 2 of Conemaugh Township. According to Appellants, the compatibility provision of Section 303(b)(3) is "absolute," and common pleas erred in ignoring this "absolute" provision. (Appellants' Br. at 16.) Appellants contend that common pleas' broad interpretation of the word "compatible" failed to consider the absolute need to preserve the integrity of election district boundaries, which is consistent with a rational state policy to prevent gerrymandering elections. (*Id.* at 18-19.) Appellants

---

and the **fundamental** principles of the one person, one vote requirement of the United States Constitution**, which must be given precedence**. Additionally, **contrary** to the dissent's statement that no evidence of a more equal plan was presented, thus meaning the Status Quo Plan could be the plan that was "as equal as possible," *id.* at __, slip op. at 21, there **was evidence** that the At-Large Plan was more equal than the Status Quo Plan because there would be no population deviations between regions as there would be no regions.

[26] Section 502 of the Election Code adds that "[(3) w]hen a school district crosses county lines, the regions of the school district shall be composed of contiguous election districts." 25 P.S. § 2702. There is no dispute that all the plans presented to common pleas met this requirement.

30

posit that the fact that an election could be run under the Modified Regional Plan does not make the Modified Regional Plan consistent with Section 303(b)(3)'s compatibility provision.

The District responds that the compatibility provision is not "absolute," as the *Hazleton* Court recognized that compelling circumstances could allow the normally strict reading and imposition of the compatibility provision of Section 303(b) to give way to a broader reading and the equality provision. The District points to its configuration and multi-county makeup and the fact that if Blairsville Borough and the entirety of Burrell 2 were combined that region would contain 40% of the District's overall population and create further inequality to establish the type of compelling circumstances contemplated in *Hazleton*. It observes that the Indiana County portion of the Status Quo Plan already had split election districts, in which a single precinct administers different elections for each side of the split in a way that allows for the districts to remain in harmony and capable of existing together without conflict and without affecting the election district's boundaries. This reflects, the District argues, that such arrangement can be "compatible" with the election district's boundaries, as common pleas found.

Upon review, we find no error or abuse of discretion in common pleas' interpretation of "compatible," which, as discussed below, is consistent with the term's plain meaning and balances the important interests and unique factors at issue, including the need to read Section 303(b)(3) in a way that respects, not violates, the United States Constitution, the realities of the multi-county nature of and location of municipalities in the District, the existing presence of split election districts, and the diverse communities of interest that the parties want to preserve through the use of a regional plan. Common pleas' interpretation gives effect to the

31

statutory language and these interests and factors in a way that Appellants' contrary interpretation, which focuses on a single factor, does not.[27]

The parties' arguments require the Court to examine the language of Section 303(b)(3) and, in particular, the meaning of the word "compatible" to ascertain the General Assembly's intent. Section 1921(a) of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1921(a). In ascertaining the intent of the General Assembly, we are to look at the words used by that body, as that is the best evidence of its intent. 1 Pa.C.S. § 1921(b). If the words are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. *Id.* We ascertain the plain meaning of a statute by ascribing to the particular words and phrases the meaning which they have acquired through their common and approved usage. Section 1903 of the Statutory Construction Act, 1 Pa.C.S. § 1903. Only when the words used by the General Assembly are not explicit, do we turn to other factors to ascertain its intent. 1 Pa.C.S. § 1921(c). As part of this review, we are mindful that "courts have the **duty to avoid constitutional difficulties, if possible**, by construing statutes in a constitutional manner." *Ludwig*, 874 A.2d at 628 (emphasis added). *See also* Section 1922(3) of the Statutory Construction Act, 1 Pa.C.S. § 1922(3) ("In ascertaining the intention of the General

---

[27] Appellants further argue common pleas erred in relying on Section 502 to "create new election districts" as an alternative basis for approving the Modified Regional Plan because that section was not before the court. (Appellants' Br. at 20-21, 25 (citing *In re Reapportion Wyomissing Area Sch. Dist.* (Pa. Cmwlth., No. 835 C.D. 2017, filed Jan. 5, 2018), slip op. at 7 (holding that Section 502 of the Election Code and Section 303(b) of the School Code are not to be read *in pari materia*)).) The District also asserts Section 502 authorized common pleas to create or alter election districts in multi-county school districts in cases involving a Section 303(b) challenge, which is what common pleas did here to resolve the population inequality. Because of our disposition, we do not address Appellants' challenge to common pleas' alternative reasoning.

Assembly in the enactment of a statute" it is presumed "[t]hat the General Assembly does not intend to violate the Constitution of the United States.").

Section 303 of the School Code authorizes the election of school boards through the use of at-large elections or, at the choice of a school district's voters, regional elections or a combination of at-large or regional elections. 24 P.S. § 3-303. This section also authorizes a school district, or its voters, to alter the manner in which the school board may be elected through a petition process before a court of common pleas. In authorizing the use of regional elections, the General Assembly recognized that some school districts may consist of multiple communities of interests and that the district's voters may want to ensure that the school board contains members that reflect those differing interests, and the majority and minority viewpoints present in that school district. The presence of such voices at the table allows for differing perspectives giving rise to more thoughtful and developed decision making. Since its inception, resulting from the merger of two school districts, the District's voters have chosen to elect their school board by regions, thereby ensuring that the different communities, in size and interests, retain a voice on the school board.

When a school district's school board is elected by region, Section 303(b)(3) of the School Code states that "[t]he boundaries of the region[] shall be fixed and established in such manner that the population of each region shall be as nearly equal as possible and shall be **compatible** with the boundaries of election districts." 24 P.S. § 3-303(b)(3) (emphasis added). The School Code does not define "compatible," and none of our decisions have directly addressed the meaning or scope of that word. In this instance, we may examine dictionary definitions to determine a word's meaning. *Commonwealth v. Gamby*, 283 A.3d 298, 307 (Pa.

33

2022). Common pleas, with the aid of a dictionary, defined the word "compatible" as meaning "capable of existing together in harmony" or "to exist or occur together without conflict." (Op. at 9-10.) These definitions are consistent with those this Court has found.[28]

Appellants read "compatible" as meaning the election district boundaries **must remain completely intact** and no split of an election district is permitted, a reasonable interpretation, based on *Chichester I*'s language. Common pleas concluded, and the District argues, that "compatible" can mean a situation where the split portions of an election district exist together in harmony **within the original boundaries** through the administration of elections, as exemplified by what is already occurring in the Status Quo Plan's Indiana County portion, where a preexisting split of two election districts is present. This is also a reasonable interpretation, particularly where it results in near perfect population equality and gives effect to the undisputed joint desire of the parties to maintain regional representation reflecting the District's separate and distinct communities of interest. (*See* Appellants' Br. at 7-8; The District's Br. at 28.) Notably, reading "compatible" broadly, in these unique circumstances, is not inconsistent with the definition of election district, which is "a district, division or precinct . . . within which all qualified electors vote at one polling place," Section 102 of the Election Code, 25 P.S. § 2602. This definition does not prohibit electors from voting in different electoral races within a district but requires only that they vote at one polling place,

---

[28] *See, e.g.*, "Compatible," https://dictionary.com/browse/compatible ("capable of existing or living together in harmony"; "able to exist together with something else") (last visited Dec. 16, 2024); "compatible," https://merriam-webster.com/dictionary/compatible ("capable of existing together in harmony") (last visited Dec. 16, 2024); "compatible," Webster's Third New International Dictionary 436 (2001) ("capable of existing together without discord or disharmony").

as is **already** occurring in two existing split election districts, where voters elect members of school boards of two **completely different school districts** from the **same precinct**. This is what common pleas contemplated when it approved the Modified Regional Plan. As there are two reasonable interpretations of the word "compatible," we believe it to be ambiguous. *A.S. v. Pa. State Police*, 143 A.3d 896, 905-06 (Pa. 2016).

Section 1922(3) of the Statutory Construction Act requires us to presume that the General Assembly does not intend to violate the United States Constitution, 1 Pa.C.S. § 1922(3), and to interpret statutes in order to avoid constitutional difficulties, *Ludwig*, 874 A.2d at 628. In other words, the standard set forth by the United States Constitution is the floor with which all statutes must comport, and common pleas' interpretation is more consistent with the one person, one vote principles than Appellants' contrary interpretation, as it complies with directive of *Reynolds* that the "**overriding objective** must be **substantial equality** of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . ." 377 U.S. at 579 (emphasis added). Imposing upon the word "compatible" the inflexible meaning proffered by Appellants may support a rational interest of maintaining election district boundaries, but a state interest, even if "rational, **cannot constitutionally** be permitted to **emasculate the goal of substantial equality**." *Mahan*, 410 U.S. at 326 (emphasis added).

This Court recognized this principle in *Cameron County*, finding the four-to-one deviation invalidated the plan despite *Chichester I*'s declaration of the priority of the compatibility provision under Section 303(b)(3). *Cameron Cnty.*, 456 A.2d at 228. We did so more expressly four years later when, in *Hazleton*, we cited

35

*Chichester I*'s holding but **included a caveat that** "**compelling circumstances**" could alter the analysis under Section 303(b)(3), 524 A.2d at 1086 (emphasis added), which were not present in that matter. The *Hazleton* Court further suggested that, if it was impossible for all of the requirements of Sections 303(b)(3) and 502 to be met, "obviously **some** requirement would have to **give way**." *Id.* at 1085 (emphasis added). That the Court included these caveats signals that the contiguity provision is **not always preeminent** or requires a strict interpretation, as Appellants argue. Moreover, absent from the analysis in *Hazleton* was any indication that the regional representation option was unavailable under those circumstances, only that something in Section 303(b)(3) would have to "give way." *Id.*

Common pleas' interpretation gives effect to the General Assembly's intent that regional representation be available to those school districts whose voters want to elect their school board members in that manner, as the parties do here, while also recognizing the practical realities of shifting populations and potentially infinite configurations of election districts, particularly in multi-county school districts. Ultimately, Section 303(b)(3) requires **only** that the regions be compatible with election districts, **not** that they be coextensive or identical. This does not mean that all election district splits would be permissible, as a regional plan that splits more election districts than absolutely necessary to ensure constitutional compliance or in a manner that prevents them from being administered in harmony with existing borders, cannot be said to be compatible. But that is not the case here, where the proposed two split election districts will be akin to the existing election district splits present in the Indiana County portion of the Status Quo Plan, wherein the election of District school board members from two regions can be administered through a single precinct. Arguably, this is of lesser moment than what occurs in the existing

36

split election districts, where the voters, depending on their precise address, elect school board members **of different school districts** from the **same precinct**.

Common pleas essentially held, consistent with the caveat in *Hazleton*, that a strict reading of "compatible" had to "give way" to a broader reading here because the circumstances were unique and compelling, given the constitutional issue at hand, the parties' historic divisions, and the evidence of the existing split districts in Indiana County. We, similarly, would describe the circumstances here as "compelling" and warranting an interpretation of "compatible" that respects and assures compliance with the constitutional mandate that "each person's vote counts as much as another's, as far as practicable," *Hadley*, 397 U.S. at 57, gives effect to the General Assembly's intent to allow for regional school board elections, which is the parties' undisputed preference, and does not make changes beyond what is needed to accomplish these goals. Therefore, in concluding that the Modified Regional Plan, which can be implemented in a manner that allows the election districts to exist together in harmony and/or without conflict, common pleas committed no error of law.[29] Rather, that decision gave primacy and effectuated the

---

[29] Judge Fizzano Cannon's dissent would hold that common pleas erred in finding that the Modified Regional Plan meets the requirements of the School Code, citing past cases from this Court, and in turn the Superior Court, regarding which of the School Code's requirements are paramount and holding that the compatibility provision was preeminent. The dissent appears to discount, at least in part, *Mahan*, *Abate*, and *Holt*, because they did not involve the apportionment of regional school district voters and a "conflict with the School Code's precinct compatibility requirement" and, therefore, are not applicable to that process. *In re River Valley*, __ A.3d at ___ (Fizzano Cannon, J., concurring and dissenting), slip op. at 15. The principles of ensuring voter equality set forth in those cases, however, are applicable regardless of the specific type of election at issue so as to prevent the "emasculat[ion of] the goal of substantial equality," which "cannot constitutionally be permitted." *Mahan*, 410 U.S. at 326 (emphasis added).

This dissent further concludes that, under the few cases referencing regional plans that "split districts," such splits are not permitted. *In re River Valley*, __ A.3d at __ (Fizzano Cannon, J., concurring and dissenting), slip op. at 11-14 (citing, *e.g.*, *Wyomissing Area Sch. Dist.* (Pa.
**(Footnote continued on next page…)**

Cmwlth., No. 835 C.D. 2017, filed Jan. 5, 2018); *Consol. of Elec. Regions*, 522 A.2d 667, 670 (Pa. Cmwlth. 1987).)  Neither of those cases, nor any case cited by that dissent, however, involved an argument that the word "compatible" could be more broadly read or involved a county where split voting districts **already existed**.  Indeed, the dissent acknowledges that the interpretation of "compatible" was **not at issue** in those cases.  *Id.* at __ & n.7, slip op. at 11-14 & n.7.

Moreover, although Judge Fizzano Cannon's dissent maintains that the split voting districts in Blacklick Township and Young Township, made necessary due to their involving two school districts, do not implicate the precinct compatibility requirement of Section 303(b), *id.* at __, slip op. at 8, their existence and the ongoing, successful management of multiple elections within the same precinct support how a "split" can be made in harmony, or compatibly, within existing boundaries.  It is not, as this dissent states, that the District seeks to "ignore" the compatibility requirement, *id.* at __, slip op. at 17; rather, it seeks a broader interpretation, supported by the dictionary definition of that term, *Hazleton*, and the facts found by common pleas.

Judge Wallace's dissent concludes that the "plain meaning" of the "compatibility" requirement is that there can be no split election districts, finding the majority's resort to dictionary terms to be unpersuasive.  *In re River Valley*, __ A.3d at __ (Wallace, J., concurring and dissenting), slip op. at 4.  However, examining dictionary definitions are a longstanding way of ascertaining the General Assembly's intent, *O'Neal v. State Employees' Retirement Board*, 280 A.3d 873, 885 (Pa. 2022), and that body chose to use the more flexible word compatible, rather than coextensive or identical, in Section 303(b)(3) to describe the relationship between regions and election district boundaries.  The ability for an election district to administer, jointly within its boundaries, elections for multiple school districts, as currently exists, or elections for two regions of the Board, as approved by common pleas, reflects that different regions can exist together and in harmony within the boundaries of one election district, as contemplated by Section 303(b)(3).

Judge Wallace's dissent also suggests that the majority does not "acknowledge the reality that our General Assembly chose to make an at-large plan the default method of electing school board directors," and that such method "poses no constitutional difficulties and eliminates any 'compelling' need to split election districts."  *In re River Valley*, __ A.3d at __ (Wallace, J., concurring and dissenting), slip op. at 4.  That dissent indicates that there is no need to perform the compatibility analysis because the At-Large Plan is the constitutional alternative to the Status Quo Plan and would be favored by the General Assembly over a regional plan that splits election districts.  *Id.* at 5.  However, although the General Assembly provided that at-large plans are the "default," it also authorized the creation of regions to account for differences that may occur within school districts and used the more flexible word "compatible" in setting forth the means of creating such regions.  The solution proposed by the District, and approved by common pleas, is consistent with the United States Constitution and Section 303(b) of the School Code **and, critically**, **gives effect to the District's decision, and the parties' desire**, **to hold regional elections in order to preserve the different communities of interest.**  And that view is consistent with our Court's recognition that the interpretation of Section 303(b)(3) that the compatibility provision is absolute, set forth in *Chichester I* and its progeny, **could be altered in the face of compelling circumstances**, *Hazleton*, 524 A.2d at 1086, which exist here.

38

guarantees of the Fourteenth Amendment that "qualified voter[s] in a local election . . . ha[ve] a constitutional right to have [their] vote counted with substantially the same weight as that of any other voter[,]" *id.* at 53, while recognizing the unique circumstances of the District.[30]

## IV.    CONCLUSION

"If one person's vote is given less weight through unequal apportionment, [that person's] right to equal voting participation is impaired just as much when [the person] votes for a school board member as when [the person] votes for a state legislator." *Hadley*, 397 U.S. at 54.  When this occurs, the one person, one vote guarantee, enshrined in the Fourteenth Amendment and the overriding objective in reapportionment matters, is violated.  Mindful of this, and our obligation to interpret statutes so as to avoid constitutional conflicts, we discern no error in common pleas' decision rejecting the Status Quo Plan and accepting the Modified Regional Plan.

_____

[30] Because we conclude that common pleas did not err in finding the Status Quo Plan unconstitutional and the Modified Regional Plan valid, we do not address Appellants' arguments related to common pleas' alternative holding, made in case the Modified Regional Plan was found to be invalid on appeal, that approved the At-Large Plan over the Status Quo Plan, had the latter been a valid plan.  However, to the extent Judge Fizzano Cannon's dissent would remand for common pleas to reconsider its conclusion that the At-Large Plan was preferable to the Status Quo Plan, where the latter could be determined to be the regional plan that is as equal as possible upon remand, common pleas **expressly concluded** that, **if the Status Quo Plan was valid**, the At-Large Plan would **better suit** the District's needs and, therefore, **was preferable** to the Status Quo Plan. (Op. at 14.)  Specifically, common pleas' explained:

> due to the current population deviations, the projected future population changes, the difficulties in drawing regions that are compatible with election district, and in consideration of the factors discussed above[, relating to the benefits of candidates having to campaign throughout the District and "mitigat[ing] the conflict that appears to remain within the District,] this [c]ourt would approve the implementation of the At-Large [P]lan.

(*Id.* at 12-14.)  Thus, common pleas has **already performed the analysis** for which the dissent would remand.

39

Ultimately, common pleas' decision respects the primacy of the Fourteenth Amendment's mandate, as well as the General Assembly's intent to allow voters to elect school board members by region to ensure that different perspectives and voices are present at the table (even if not a majority), in a manner that is not inconsistent with Section 303(b)(3). Accordingly, common pleas' Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: River Valley School District   :
  :
Appeal of: Beverly Caranese, Jessica   :
Clawson, Melanie Pantalone, Nathan   :   No. 136 C.D. 2023
Baird, Douglas Cull, Gwendolyn Cerra,   :
Christa Watt, Cindy Cribbs and Deanna   :
Fink   :

# **O R D E R**

**NOW**, December 17, 2024, the Order of the Court of Common Pleas of Indiana County, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: River Valley School District          :
                                             :
Appeal of:  Beverly Caranese,                :
Jessica Clawson, Melanie Pantalone,          :
Nathan Baird, Douglas Cull,                  :
Gwendolyn Cerra, Christa Watt,               :    No. 136 C.D. 2023
Cindy Cribbs and Deanna Fink                 :    Argued: February 7, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE STACY WALLACE, Judge
           HONORABLE MATTHEW S. WOLF, Judge

CONCURRING AND DISSENTING OPINION
BY JUDGE FIZZANO CANNON                          FILED: December 17, 2024


          I concur in the majority's analysis of Appellants' objection to the

testimony of the expert witness for River Valley School District (District) forecasting

future population growth in the District as part of his opinion on the propriety of the

Modified Regional Plan of voting for school directors proposed by the District.[1]  I

---

[1] I agree with the majority's conclusion that the objection to this evidence was not
preserved, in that the objection on the record related to relevance rather than asserting that the
testimony was speculative as Appellants are now arguing.  In addition, I observe that Appellants'
argument on this issue was not developed.  If Appellants were suggesting that this evidence was
improper because the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333,
*as amended*, 25 P.S. §§ 2600-3591, requires reliance on census information in determining
population, this Court has observed that "[t]here is nothing improper in considering the effect of
future population changes in determining which of two compliant plans is more likely to be stable
and therefore better serves the interest of a school district." *In re Pet. to Realign Reg'l Election
Dists. in Pennsbury Sch. Dist.*, 79 A.3d 1219, 1229 (Pa. Cmwlth. 2013).  Here, the opinion of the
Court of Common Pleas of Indiana County (common pleas) mentioned future population changes
in noting the trends that appear to be developing, but common pleas does not appear to have based

respectfully disagree, however, with the majority's disposition of this appeal. First, the Court should reverse common pleas' determination that the Modified Regional Plan complies with the Public School Code of 1949 (School Code),[2] where the Modified Regional Plan would require splitting two voting precincts between regions. Second, the Court should vacate common pleas' determination that the District's current districting plan (Status Quo Plan) does not comply with the School Code's population deviation limitation and should remand to allow common pleas to determine, in the first instance, whether the existing population deviations among regions are "as nearly equal as possible" as required by Section 303(b)(3) of the School Code, 24 P.S. § 3-303(b)(3), based on the evidence of record, and if so, whether the existing population deviations are within constitutional limitations. Finally, the Court should vacate common pleas' determination that the District's alternate At-Large Plan to elect school directors District-wide, without regions, serves the District's interests better than the Status Quo Plan, and should remand this matter to common pleas for further consideration of that issue. Accordingly, I respectfully dissent in part.

## I. Background

Section 303 of the School Code, 24 P.S. § 3-303, authorizes a school district to elect its school board members either at large or in separate regions as approved by a court order. This case involves a proposal for election redistricting relating to school board directors in the District, which is partly in Indiana County

---

its decision on those perceived trends. *See generally In re: River Valley Sch. Dist.* (C.P. Indiana, No. 10697 CD 2022, filed Jan. 27, 2023) (common pleas op.).

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 – 27-2702.

and partly in Westmoreland County.  The Status Quo Plan is a regional plan with the following three regions:

Region 1 – Blairsville Borough, Precincts 1-3; Burrell Township, Precinct 2.

Region 2 – Burrell Township, Precinct 1; Blacklick Township, Precinct 1 (part[3]); Conemaugh Township, Precinct 2.

Region 3 – Conemaugh Township, Precincts 1 and 3; Saltsburg Borough, Precinct 1; Loyalhanna Township, Precincts 1-2; Young Township, Precinct 3 (part).

Reproduced Record (R.) 20;[4] *see also In re: River Valley Sch. Dist.* (C.P. Indiana, No. 10697 CD 2022, filed Jan. 27, 2023) (common pleas op.) at 2-3.  The Status Quo Plan was approved by court order in 2007.  At that time, based on the 2000 Census, the populations were:

Region 1 – 5,429
Region 2 – 4,474
Region 3 – 4,460

*Id.* at 3.  Due to changing demographics, the populations at the time of the District's proposal of the Modified Regional Plan were:

Region 1 – 5,024
Region 2 – 3,381
Region 3 – 3,895

*Id.*  In May 2022, the District filed a petition with common pleas for approval of a Modified Regional Plan or, in the alternative, of an At-Large Plan.  The Modified Regional Plan would divide the voters much more equally among the regions:

---

[3] The current split voting in Precinct 1 of Blacklick Township and Precinct 3 of Young Township is necessary because each of those two precincts lies in two different school districts.

[4] The reproduced record is not numbered in compliance with Rule 2173 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2173.  For clarity, the reproduced record is cited herein using the numbering format used by Appellants.

Region 1 – 4,264
Region 2 – 4,244
Region 3 – 4,242

*Id.* at 4. However, the Modified Regional Plan would require two voting precincts to be split between two regions. *Id.*

Beverly Caranese, Jessica Clawson, Melanie Pantalone, Nathan Baird, Douglas Cull, Gwendolyn Cerra, Christa Watt, Cindy Cribbs, and Deanna Fink (Appellants) intervened, opposed the Modified Regional Plan, and sought to retain the Status Quo Plan. In January 2023, common pleas issued an opinion and order approving the Modified Regional Plan and, alternatively, approving the At-Large Plan. *See generally* common pleas op. Appellants sought review in this Court regarding both aspects of common pleas' decision.

## II. Discussion

## A. The Modified Regional Plan

Appellants first challenge common pleas' reasoning that divided precincts are permissible under the School Code and by analogy to the Election Code in its authorization of new election districts. As a corollary, Appellants assert that the current deviation from mean population among the regions in the Status Quo Plan is within acceptable limits and is, in fact, as nearly equal as possible, given that dividing precincts is improper.

Section 303(b)(3) of the School Code provides, in pertinent part, that

[t]he boundaries of the regions [for the election of school directors] shall be fixed and established in such manner that *the population of each region shall be as nearly equal as possible and shall be compatible with the boundaries of election districts*. Such plan for the division of the school district shall be submitted for approval to the court of common pleas. If approved by such court, the clerk

thereof shall certify the regional boundaries contained therein to the county board of elections. In the event of any division, redivision, alteration, change or consolidation of election districts which renders regional boundaries incompatible with the boundaries of election districts, a new plan shall be developed and submitted for court approval in like manner. Any proposed change in an approved plan, including abolition of regional representation, shall be submitted for approval to the court of common pleas by the board of school directors, or by a petition of the resident electors within the district. . . .

24 P.S. § 3-303(b)(3) (emphasis added).

Section 502 of the Election Code, provides, in pertinent part, that

the court of common pleas of the county in which the same are located, may form or create new election districts by dividing or redividing any borough, township, ward or election district into two or more election districts of compact and contiguous territory, having boundaries with clearly visible physical features conforming with census block lines from the most recently completed [f]ederal decennial census and wholly contained within any larger district from which any [f]ederal, [s]tate, county, municipal or school district officers are elected, or alter the bounds of any election district, or form an election district out of two or more adjacent districts or parts of districts, or consolidate adjoining election districts or form an election district out of two or more adjacent wards, so as to suit the convenience of the electors and to promote the public interests . . . . When a school district crosses county lines, the regions of the school district shall be composed of contiguous election districts.

25 P.S. § 2702.

Consistent with the quoted requirements of the School Code and Election Code above, common pleas correctly observed that a regional plan for the election of school directors must meet three requirements:

(1)    the population of each region must be as nearly equal as possible;

(2)     the regions must be compatible with election district boundaries; and

(3)     each region must be contiguous.

Common pleas op. at 5.  Here, the parties agree that the Status Quo Plan meets the second and third requirements.  The inequalities of the populations of the three regions under the 2020 Census have given rise to the proposed change of the regional plan at issue in this case.

The equal population requirement is grounded in constitutional principles:

> The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution[5] requires that the districts by which representatives are elected be "of nearly equal population, so that each person's vote may be given equal weight in the election of representatives." *Voinovich v. Quilter*, 507 U.S. 146, 160-61 . . . (1993).  This "one person, one vote" principle applies to school board elections.  *Hadley v. Junior Coll*[.] *Dist*[.] *of Metro*[.] *Kansas City*, 397 U.S. 50, 53-56 . . . (1970).  Population deviations under 10%, however, are considered minor deviations from mathematical equality and are insufficient by themselves to make out a *prima facie* case of discrimination under the Equal Protection Clause. *Voinovich*, 507 U.S. at 161; *Brown v. Thomson*, 462 U.S. 835, 842 . . . (1983); *In re Mun*[.] *Reapportionment of* [*Twp.*] *of Haverford*, 873 A.2d 821, 834 (Pa. Cmwlth. 2005) (*en banc*).  Therefore, where the maximum population deviation in a state or local reapportionment plan is under 10%, the mere fact that greater mathematical perfection is possible is not sufficient to establish a violation of the Equal Protection Clause without proof of discriminatory conduct or a deliberate attempt to increase inequality. *Compare Cox v. Larios*, 542 U.S. 947 . . . (2004), *summarily aff*[']*g* 300 F. Supp. 2d 1320, 1325-34 (N.D. Ga. 2004) (state legislative reapportionment plan

---

[5] Section 1 of the Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

with 9.98% maximum deviation violated Equal Protection Clause where there was evidence that plan systematically maximized population deviations by overpopulating certain types of districts and underpopulating others through oddly shaped districts) *with Reapportionment of T*[*wp.*] *of Haverford*, 873 A.2d at 825-27, 833-36 (local reapportionment plan with 9.52% maximum deviation was constitutional under Equal Protection Clause where there was no evidence of discrimination in its formulation and the only basis for the claim that "one person, one vote" was violated was that another plan had been developed with a lower maximum deviation).

*In re Pet. to Realign Reg'l Election Dists. in Pennsbury Sch. Dist.*, 79 A.3d 1218, 1224-25 (Pa. Cmwlth. 2013).

Here, common pleas observed that under the Status Quo Plan, Region 1 has 39% of the population, Region 2 has 30%, and Region 3 has 31%. Common pleas op. at 7. The "median or average" population is 4,250. *Id.* Region 1 deviates from the mean by 18.2% (compared to a deviation of 13.4% in 2006, according to Appellants' Brief), Region 2 by 9.9% (compared to 6.5% in 2006), and Region 3 by 8.4% (compared to 7.33% in 2006). *Id.* Common pleas placed significance on the fact that Region 1's population deviated from that of Region 2 by 28%, thus creating a vote dilution of 28% in Region 2 as compared to Region 1. *Id.*

Common pleas found that the Status Quo Plan violated the nearly-equal population requirement of School Code Section 303. Common pleas op. at 8. Accordingly, common pleas concluded that the Status Quo Plan did not constitute a population-based plan with minor deviations as required by the School Code and the Election Code. *Id.* By contrast, common pleas found that the Modified Regional Plan satisfied the equal population requirement and provided for the requisite contiguous voting districts in each region. *Id.* at 8.

The Modified Regional Plan, however, achieves nearly-equal population divisions at the expense of compatibility of the election districts. In order to equalize the populations in the regions, the Modified Regional Plan would divide each of two voting precincts by addresses between two regions. Common pleas op. at 8-9. Common pleas explained that this division was necessary because the precinct designated as Burrell Precinct 2 completely encircles the Borough of Blairsville. *Id.* at 9. Together, Burrell and Blairsville would constitute 40% of the population of the District, unless two precincts are divided. *Id.* Notably, common pleas acknowledged that "[o]rdinarily the *consideration of the compatibility of a plan may be limited to only a consideration of the proposed region boundaries in comparison to the boundary lines of election districts within that region.*" *Id.* at 9-10 (emphasis added). Common pleas suggested that this case is "unique" because Indiana County already has procedures in place for potential divisions of election precincts, with safeguards to assure that the votes are properly cast and counted in those precincts with divided votes. *Id.* at 10. However, nothing in the language of the School Code suggests that the compatibility requirement may be obviated merely because a precinct has the capability of dealing with a voting split.

The majority points to record testimony that two voting precincts in the county are already split for purposes of school district elections. However, those splits are necessitated by the fact that each of those precincts lies partly in each of *two separate school districts, not two different regions created within a single school district.* The precinct compatibility requirement of the School Code governing regional divisions of a single school district is, therefore, not implicated in those instances.

Respectfully, I also disagree with the majority's view that the ability to cope with split precincts implies they are compatible within the meaning of the School Code. Common pleas' reasoning on this issue, with which the majority agrees, is in error.

Common pleas reasoned that Section 303(b)(3) of the School Code does not require that a region must be "consistent with" or "follow" election district boundaries in order to be "compatible" with them. Common pleas op. at 9-10 (additional quotation marks omitted) (citing 24 P.S. § 3-303(b)(3)). Citing the common usage principle of defining terms set forth in 1 Pa.C.S. § 1903(a), common pleas applied the dictionary meaning of "compatible" as "capable of existing together in harmony; (of two things) able to exist or occur together without conflict." Common pleas op. at 9. Common pleas rejected Appellants' argument that the Modified Regional Plan, by dividing two precincts by address for purposes of voting for school directors in order to provide for equal population and contiguousness in each region, would violate the School Code. Common pleas op. at 9-11.

Further, common pleas observed that it had authority under Section 502 of the Election Code to create a new election district. Common pleas op. at 10-11. Common pleas reasoned that approving divided voting within a precinct did not require creation of a new district and was implicitly within the court's authority, particularly where such divisions already exist in other contexts. *Id.*

Ultimately, common pleas found "that the Modified Regional Plan incorporates a plan of population-based representations with minor deviations free from any taint of arbitrariness or discrimination that is compatible with the boundaries of election districts and is in compliance with 24 P.S. § 3-303 and 25 P.S. § 2702." Common pleas op. at 11. On balance, to avoid disruption and assure fair

representation, common pleas concluded that the Modified Regional Plan would "better achieve[] the requirements of the [] District" than the At-Large Plan. *Id.* at 14. Therefore, common pleas approved the Modified Regional Plan. *Id.*

Appellants posit that two of the three mandates for voting regions – contiguousness and compatibility – are absolutes; only equality of population is flexible. In other words, voting districts in a region must be completely contiguous, and a voting precinct cannot be divided between two regions; however, populations among regions in a given school district need only be "as nearly equal as possible" in light of the constraints arising from compliance with the other two factors. Appellants correctly cite and rely on *Petition of Board of School Directors of Hazleton Area School District (Appeal of Valley Education Association)*, 524 A.2d 1083, 1086 (Pa. Cmwlth. 1987), for this proposition.

Moreover, as the Superior Court explained in *In re Chichester School District*, 234 A.2d 187 (Pa. Super. 1969) (*Chichester I*),

> [w]hen it is impossible to maintain the boundaries of existing election districts and, at the same time, form regions nearly equal in population, something has to give.
>
> We feel that the [School Code] itself furnishes the answer. It provides that the regions "shall" be compatible with the boundaries of election districts but only that the population be as nearly equal as possible. Therefore it is apparent that *the integrity of the election districts must take priority over the population factor*.

*Id.* at 190 (emphasis added). Although Superior Court decisions are not binding on this Court, they offer persuasive precedent where they address analogous issues; the Superior Court's holdings are particularly persuasive where, as in *Chichester I*, the Superior Court was exercising jurisdiction that now lies with this Court. *See Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

The parties evidently do not dispute the contiguousness requirement. Appellants challenge common pleas' application of the dictionary meaning of "compatible" as able to exist in harmony without conflict (they also note common pleas' failure to cite any specific dictionary) and common pleas' resulting conclusion that a region may be "compatible" with existing voting districts while dividing a voting precinct between two regions. Citing *Hazleton*, 524 A.2d at 1085, Appellants correctly posit that the meaning of "election district" in the School Code includes "precincts" and "divisions." *See also Pennsbury*, 79 A.3d at 1221 n.2 (noting that "[t]he term election district refers to the polling place unit or precinct"). Based on that premise, Appellants reason that dividing a voting precinct between two regions violates Section 303 of the School Code.

Appellants' argument is well taken. They cite *In re Petition Reapportion Wyomissing Area School District* (Pa. Cmwlth., No. 835 C.D. 2017, filed Jan. 5, 2018). In *Wyomissing*, this Court affirmed a trial court's denial of a petition to change a school district's method of electing school directors from an at-large system to a three-region system, where the proposed regional plan would have required splitting one of the school district's voting precincts between two regions. This Court agreed with common pleas that the proposed plan violated Section 303 and that the requirement of compatibility with voting district boundaries could not be overlooked. *Id.*, slip op. at 6-7.[6]

I recognize that in *Wyomissing*, the appellant conceded that the proposed split of a voting precinct failed to comply with Section 303. Thus, the

---

[6] This opinion is cited as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

meaning of "compatible" was not directly at issue.[7] However, *Wyomissing* provides the most closely analogous discussion of the issue, and along with its analysis of the interplay of the Election Code and the School Code, discussed further below, provides persuasive authority in support of Appellants' position.

*In re Consolidation of Election Regions*, 522 A.2d 667 (Pa. Cmwlth. 1987), supports this reasoning. There, a court order altered the boundaries of certain voting precincts in Clearfield County. As a result, two precincts were consolidated that had previously been in two separate regions of a school district's voting plan. This Court observed that "[b]ecause the consolidation combined [two precincts] which were in separate regions before the consolidation, it was necessary to realign the precincts in order to re-determine the composition of each region" so as to avoid

---

[7] *Petition of Board of School Directors of Hazleton Area School District (Appeal of Valley Education Association)*, 524 A.2d 1083 (Pa. Cmwlth. 1987), also offers analogous, though not binding, support for Appellants' argument. There, this Court reasoned that

> the preservation of political subdivision lines to avoid gerrymandering and to permit voters in those subdivisions a greater voice in the state legislature on local issues were rational state objectives. That being so, a statute mandating the preservation of the bound[a]ry lines of the most rudimentary of areas in the election process, the election district (which might be called "precincts" or "divisions") compels a similar conclusion.

*Id.* at 1085. The discussion containing the statement relates to contiguousness and population equality, not to compatibility with voting district boundaries. Thus, the statement is *dictum*. Nonetheless, this statement implicitly supports Appellants' argument here that precincts cannot be divided within voting regions.

Appellants also cite *Spring-Ford Area School District Division Case*, 234 A.2d 184 (Pa. Super. 1967); *In re Chichester School District*, 234 A.2d 187 (Pa. Super. 1969) (*Chichester I*); and *Cameron County School Board, Resident Electors Appeal*, 456 A.2d 226 (Pa. Cmwlth. 1983). In all of these cases, the courts' opinions merely echo the School Code's language regarding compatibility. They do not discuss the meaning of that language, which was not at issue. I note, however, this Court's reference in *Cameron County* to the fact that election districts could be preserved while avoiding population inequalities, by moving to an at-large voting plan. 456 A.2d at 228.

splitting a precinct between two regions. *Id.* at 668. Although the issue in that case was whether the proposed realignment provided for regions with populations as nearly equal as possible, both this Court and the parties clearly assumed that a precinct with parts of two regions in it would violate the School Code.

Further support by analogy is found in *Carlynton School District v. James*, 314 A.2d 891 (Pa. Cmwlth. 1974). In that case, a school district implemented a regional plan that divided its regions, in part, by reference to specific wards in the Borough of Crofton. Later, an ordinance altered the boundaries of the wards. The petitioner was a prospective school board candidate whose residence had been in the first ward of the borough but had been redesignated in the second ward due to the boundary change. Thus, the question was whether the school district's regions automatically altered with the wards' boundary changes. This Court held that they did, because the school district had described its regions by ward rather than by addresses or metes and bounds. Notably, the Court's analysis suggested that had the school district designated its regions otherwise, its regional plan would have become non-compliant with the School Code upon enactment of the borough's boundary changes:

> Whatever its reason for simply using the designation of numbered wards, this method always achieves a clear and ascertainable result. For instance, the Second Ward would always be in Region One and the Third Ward would always be in Region Two until such time as the [s]chool [d]istrict changed its plan as it has a right to do under Section 303(b). Consequently, if the election districts or wards of the borough change, the new districts or wards never become incompatible with the school district plan which utilizes numbered wards rather than specific boundaries, and the [s]chool [d]istrict is not required to revise its plan which remains workable because it is still *compatible with the boundaries of the election districts.*

> The language of Section 303(b) that reads, "In the event of any division, redivision, alteration, change or consolidation of election districts which renders regional boundaries incompatible with the boundaries of election districts, a new plan shall be developed and submitted for court approval in like manner," implies that changes may be made which will not render regional boundaries incompatible with the boundaries of election districts. We conclude that the present case is an example of such an implication.

*Id.* at 893 (emphasis added). The clear assumption underlying this Court's reasoning in *Carlynton* is that a regional plan with regions that split voting precincts would be incompatible with those precincts' boundaries, in violation of the School Code.

In addition, Appellants' argument makes sense. It is difficult to reconcile the statutory language with common pleas' interpretation of "compatible." A region that divides a precinct does not seem logically "compatible" with the precinct's boundaries. To the contrary, the requirement that "the boundaries of the regions . . . shall be compatible with the boundaries of election districts" seems aimed at *preventing* divisions of precincts such as those proposed here. It seems more likely that the word "compatible" simply reflects a recognition that, because the number of precincts in a school district may not exactly equal the number of regions in its voting plan for school directors, a region might not be coterminous with a single election district/precinct but may include several, as, indeed, is the case here.

Notably, as stated above, even common pleas acknowledged that application of the School Code's compatibility requirement would "[o]rdinarily . . . be limited to only a consideration of the proposed region boundaries in comparison to the boundary lines of election districts within that region." Common pleas op. at 9-10. Nothing in the School Code supports common pleas' suggestion that this

limitation can be ignored on the basis that a county has implemented procedures for voting where a precinct has already been split for other reasons.

The majority opines that constitutionally based federal and state decisions subsequent to those cited in this opinion require population equality to be the paramount consideration in establishing voting districts. However, the cases cited by the majority do not relate to the process of establishing regions within a single school district that conflict with the School Code's precinct compatibility requirement, nor are they applicable to that process, which, as explained below, does not require school districts to retain regional plans if they cannot achieve reasonable population equality. *See Mahon v. Howell*, 410 U.S. 315 (1973) (addressing equality of population among districts electing members of a state legislature's house of delegates); *Abate v. Mundt*, 403 U.S. 182 (1971) (upholding a districting plan for election of county supervisors with districts comprised of the county's five towns, despite population inequalities among the towns); *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711 (Pa. 2012) (addressing a reapportionment plan for state legislative districts); *see also Reynolds v. Sims*, 377 U.S. 533 (1964).

In *Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50 (1970), also cited by the majority, the United States Supreme Court held that reasonable equality of voting power must be maintained among school districts electing trustees of a local junior college. There, the Court rejected as unconstitutional a state districting statute that provided for a percentage population formula that the Court determined would always dilute the votes in larger school districts. No such systematic percentage formula is at issue here. Notably, the *Hadley* Court specifically noted that it

> would be faced with a different question if the deviation
> from equal apportionment . . . resulted from a plan that did

> not contain a built-in bias in favor of small [school] districts, but rather from the inherent mathematical complications in equally apportioning a small number of trustees among a limited number of component [school] districts.

*Id.* at 57-58.

Although population equality among regions in a school district is subject to constitutionality requirements, it is simply not true that adhering to the School Code's precinct compatibility requirement could require a school district to accept unconstitutionally broad deviations in populations between regions. This is because, if a school district finds it impossible to achieve sufficiently equal populations among regions without splitting precincts in derogation of the School Code's precinct compatibility requirement, there is an obvious *and constitutionally sound* solution: move to an at-large voting system.[8] Indeed, as the majority aptly observes, the At-Large Plan here, if adopted, would avoid inequality of populations among regions, for the simple reason that with at-large election of school directors, there would be no regions. *Accord Hadley*, 397 U.S. at 58 (distinguishing *Dusch v. Davis*, 387 U.S. 112 (1967), which upheld against constitutional challenge an election scheme requiring candidates be residents of certain districts that did not contain equal numbers of people, on the basis that "because all the officials in [*Dusch*] were elected at large, the right of each voter was given equal treatment"); *Cameron Cnty.*, 456 A.2d at 228 (observing that election districts could be preserved while avoiding population inequalities in a regional plan, by moving to an at-large

---

[8] Thus, I am not, as the majority suggests, taking a position as to whether the 28% deviation in population that is present in the Status Quo Plan is constitutionally valid. I am simply saying that if sufficient equality of population within constitutional parameters cannot be achieved without violating the School Code's precinct compatibility requirement, the solution is not to invalidate the compatibility provision, but to move to the default at-large voting system to elect school directors.

voting plan). In fact, at-large election of school directors is the default system under the School Code; voting by region is merely an added option. *See* 24 P.S. § 3-303(a) (providing that school directors, "except as otherwise provided in this act, shall be elected at large . . ."), (b)(1) & (2) (providing that school boards or electors, as the case may be, "*may* develop a plan to elect school directors from regions or to elect some school directors at large and some from regions . . .") (emphasis added). The School Code's authorization of regional and partially regional options, however, does not entitle a school district to ignore the precinct compatibility requirement in establishing regions, even if that requirement may make implementation of an optional regional voting plan impracticable in that school district's unique circumstances. In other words, a school district's inability to find a workable optional regional plan because of population equality issues created by the precinct compatibility requirement does not have constitutional implications; the legislature was not required to offer the regional option in the School Code in the first place, and the default at-large system is always available to correct any population equality problems that have arisen under an existing regional plan. Common pleas should have the opportunity to consider the preferability of the At-Large Plan here from that viewpoint on remand.

Appellants also challenge common pleas' reading of the Election Code and the School Code *in pari materia*. Appellants contend that common pleas erred by focusing on the Election Code's goal of easing election administration, rather than on the School Code's unambiguous requirements; thus, Appellants insist Section 502 of the Election Code does not authorize common pleas to approve a regional plan that violates Section 303 of the School Code.

Appellants' position is consistent with this Court's reasoning in *Wyomissing*, where this Court rejected the same argument advanced by common pleas here. There, the petitioner residents' group sought to change the school district's election of school directors from at-large to three regions. The proposed regions would have contained split election districts, but the appellant contended that, reading the Election Code and the School Code *in pari materia*, the county court's authority to create new districts allowed it to approve a three-region plan despite the plan's division of voting districts. In rejecting that argument, this Court explained:

> [The appellant] insists that Section 303(b) of the School Code should be read *in pari materia* to Section 502 of the Election Code. Specifically, [the appellant] maintains that since Section 502 of the Election Code grants [common pleas] authority to "form or create new election districts," *id.*, the violation of Section 303(b)(3) of the School Code should not prevent [common pleas] from approving the [appellant's] plan. However, Section 303(b) of the School Code dictates the development of plans to elect school directors, while Section 502 of the Election Code refers to the formation or creation of new election districts. Further, Section 303(b) of the School Code expressly applies to the actions of the interim operating committee or the board of school directors, and resident electors, whereas Section 502 of the Election Code applies to [common pleas'] authority. "The two statutes thus relate to different persons and things. Therefore, we do not regard them to be *in pari materia*." *Cherry* [*v. Pa. Higher Educ. Ass'n*], 642 A.2d [463,] 466 [(Pa. 1994) (declining to read the School Code's definition of "teacher" *in pari materia* with that term as used in the Urban and Rural Teacher Loan Forgiveness Act)[9]]. Accordingly, [common pleas] did not err by not reading Section 303(b) of the School Code and Section 502 of the Election Code *in pari materia*.

---

[9] Act of December 6, 1988, P.L. 1259, 24 P.S. §§ 5191-5197.

*Wyomissing*, slip op. at 7-8.  *Wyomissing* is persuasive authority here.  This Court, therefore, should agree with Appellants that common pleas erred in reading Section 502 of the Election Code and Section 303 of the School Code *in pari materia* in order to support the division of two precincts in this case.

Common pleas committed legal error by approving a regional plan that requires dividing two precincts, such that voters in those precincts have different candidates for school board elections, depending on the voters' addresses. Therefore, this Court should reverse common pleas' conclusion that the Modified Regional Plan complies with the compatibility requirement of Section 303 of the School Code.

Appellants also challenge common pleas' finding that the Status Quo Plan's population disparities among the three regions violate the School Code's requirement that the regions be "as nearly equal as possible" in population. Appellants observe that no alternate regional plan was proposed before common pleas other than the Modified Regional Plan, which did not comply with Section 303.[10]  Appellants assert that acceptable population deviations among regions may be even larger than those in the Status Quo Plan as long as they are not arbitrary or discriminatory.  Appellants correctly cite *In re Petition to Change Representation Plan of Octorara Area School District*, 722 A.2d 767, 771 (Pa. Cmwlth. 1999) (citing *Brown v. Thomson*, 462 U.S. 835 (1983)), for this proposition.  Appellants further posit that larger population deviations are often necessary and tolerated in local school districts, where variations in population among local geographic areas may make equalizing the populations among a school district's regions difficult or impossible, as compared to equalizing larger overall populations among, for

---

[10] Of course, as the majority correctly observes, the At-Large Plan would eliminate the problem of unequal populations by eliminating regional voting.

example, congressional districts. *See, e.g.*, *Chichester I* (involving a deviation where the population of the highest region was *more than double* the population of the lowest region); *Spring-Ford Area Sch. Dist. Div. Case*, 234 A.2d 184 (Pa. Super. 1967) (involving over 17% total deviation from low to high region populations); *Hazleton* (involving over 16% deviation from low to high region populations); *In re Pet. of Cent. Bucks Sch. Dist.*, 23 D. & C.4th 53 (1995) (involving a 25.04% total variation in region populations). As these decisions illustrate, *the amount of deviation alone is not dispositive*; rather, the determinative question is whether the populations of the regions are *as nearly equal as possible, under the circumstances* of the specific case. *See In re Pet. to Reapportion Sch. Dir. Regions of the Chichester Sch. Dist.*, 688 A.2d 1275, 1279 (Pa. Cmwlth. 1997) (*Chichester II*). Thus, here, the 28% deviation from low to high in the Status Quo Plan does not *automatically* mean that the populations of the regions are not as nearly equal as possible under the specific applicable circumstances.

Critically, common pleas here did not offer any analysis of the circumstances of this case before finding that the Status Quo Plan violated the School Code and constitutional mandates of nearly equal populations; nor did common pleas point to any indication in the record that the Status Quo Plan was arbitrary or discriminatory. Indeed, common pleas did not actually determine whether the population deviations in the Status Quo Plan are "as nearly equal as possible"; instead, common pleas found that "due to change in the population and the extent of the deviations, the Status Quo Plan no longer implements a plan of population-based representation with minor deviations." Common pleas op. at 8. That is not the standard imposed by the School Code.

At most, common pleas implicitly relied on the reduced population deviations in the Modified Regional Plan and inferred from those deviations that the Status Quo Plan does not provide populations as nearly equal as possible among regions. However, as discussed above, the Modified Regional Plan does not comply with Section 303 of the School Code because it would require splitting two precincts between regions in order to achieve its more equal population division. No alternate regional plan offering both a more equal population division and compliance with Section 303 was presented to common pleas. Thus, common pleas had no evidence before it upon which to conclude that the Status Quo Plan does not provide for the most nearly equal population deviations possible under the circumstances. Accordingly, this Court should remand this matter to common pleas for a determination of whether, in light of the School Code's contiguity requirement, the Status Quo Plan provides for regions in the District having as nearly equal populations as possible, and if so, whether the existing population disparities pass constitutional muster *under the specific circumstances* of this case.

## B. The At-Large Plan

Appellants also challenge common pleas' alternative conclusion approving the District's proposal to change to an At-Large Plan in the event that the Modified Regional Plan was not available. *See* common pleas op. at 14. Common pleas observed that Section 303(a) of the School Code provides for at-large election of school directors except as otherwise provided. Common pleas op. at 11 (citing 24 P.S. § 3-303(a)). Section 303(b) allows the creation of a regional plan in lieu of at-large election. 24 P.S. § 3-303(b). Section 303(b)(3) requires court approval for, *inter alia*, a change from a regional plan to an at-large plan. 24 P.S. § 3-303(b)(3).

CFC - 21

Common pleas explained that considerations for approval of such a change include "what impact an at-large system might have on the representation of a smaller community on the [School] Board." Common pleas op. at 12 (citing *Chichester II*, 688 A.2d at 1280). Such potential impacts include the effects of at-large voting on the rights of less represented groups and the degree of community disruption arising from a given plan. Common pleas op. at 12 (first citing *Resident Electors of Abington Heights Sch. Dist. v. Abington Heights Sch. Bd. of Abington Heights Sch. Dist.*, No. 99 CV 5343, 2003 WL 25300070, at *16 (C.P. Lackawanna Co. Jan. 31, 2003); and then citing *Chichester II*).

Common pleas found that the Saltsburg Borough and Blairsville Borough communities within the District have distinct and conflicting cultures, both historically and currently, with regard to various school administration and financing decisions. Common pleas op. at 4-5 & 12. Common pleas acknowledged Appellants' concerns that the At-Large Plan would leave some small communities with little or no representation on the School Board, in that the majority population in the Blairsville area could elect all nine School Board members. *Id.* at 13. However, common pleas posited that the same situation exists in many school districts throughout Pennsylvania. *Id.* at 13 n.5. Common pleas found persuasive the District's argument that the At-Large Plan "would mitigate the conflict that appears to remain within the [School] District" by making it necessary for School Board candidates to learn about and advocate for all electors rather than just those in one region. *Id.* at 12-13.

Appellants argue that common pleas abused its discretion in determining that the At-Large Plan would serve the District's residents better than the Status Quo Plan. Such a determination involves consideration of all relevant

factors, including those not applicable in determining whether a plan complies with Section 303 of the School Code:

> [I]n analyzing whether the Board's plan met the requirements of [S]ection 303 of the School Code, [common pleas] could not properly consider factors other than electoral boundaries and population equity. *Spring-Ford. . . .*
>
> After concluding that the Board's plan did, indeed, meet the requirements, [common pleas] . . . could properly examine other considerations. . . . Because the restrictions of [S]ection 303(b)(3) of the School Code are applicable only to the question of whether a regional plan violates the School Code, [common pleas] was not constrained by that section in making its determination regarding which of the two plans before it was the most [sic] appropriate.

*Chichester II*, 688 A.2d at 1280 (footnotes omitted).

Here, common pleas determined that the At-Large Plan would better serve the District's interests than the Status Quo Plan. However, that determination was made under the erroneous assumption that the Status Quo Plan violates the School Code and/or constitutional voting equality requirements. Contrary to the majority's suggestion, it is not clear that common pleas analyzed the preferability of the At-Large Plan from the correct legal perspective. Therefore, because this Court should vacate common pleas' decision that the Status Quo Plan violates the School Code and/or constitutional voting equality requirements and remand for further consideration, common pleas on remand should also reconsider whether the At-Large Plan is better than the Status Quo Plan in light of common pleas' conclusion on remand concerning whether the District's regions are as equal in population as possible under the Status Quo Plan. Accordingly, this Court should also vacate common pleas' decision approving the At-Large Plan and remand it to common pleas for further consideration.

For these reasons, this Court should vacate common pleas' decision that the Status Quo Plan violates the School Code, as well as common pleas' decision that the At-Large Plan is better than the Status Quo Plan, and should remand the case to common pleas to issue a new decision based on application of the correct legal principles.

### III. Conclusion

In summary, I believe this Court should (1) reverse common pleas' determination that the District's proposed Modified Regional Plan of voting for school directors complies with the School Code, where the Modified Regional Plan would require splitting two voting precincts between regions; (2) vacate common pleas' determination that the District's existing Status Quo Plan does not comply with the School Code's population deviation limitation, and remand for a determination of whether the existing population deviations among regions are "as nearly equal as possible" as required by the School Code based on the evidence of record and, if so, whether those population deviations pass constitutional muster under the specific circumstances of this case; and (3) vacate common pleas' determination that the District's alternate At-Large Plan serves the District's interests better than the Status Quo Plan, and remand for further consideration of that issue in light of common pleas' determination of the first two issues on remand.

For all of the above reasons, I respectfully dissent in part.


_____
CHRISTINE FIZZANO CANNON, Judge

Judges Covey and Wolf join in this concurring and dissenting opinion.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: River Valley School District      :
     :
Appeal of: Beverly Caranese, Jessica      :
Clawson, Melanie Pantalone, Nathan      :
Baird, Douglas Cull, Gwendolyn Cerra,      :
Christa Watt, Cindy Cribbs and Deanna      : No. 136 C.D. 2023
Fink      : Argued: February 7, 2024

BEFORE:      HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE STACY WALLACE, Judge
             HONORABLE MATTHEW S. WOLF, Judge

CONCURRING AND DISSENTING OPINION
BY JUDGE WALLACE              FILED: December 17, 2024

I agree with the Majority's analysis regarding River Valley School District's (District) population projections and its conclusion that the Status Quo Plan violates the "one person, one vote" principle derived from the Equal Protection Clause of the United States Constitution and must be set aside.[1] Respectfully, however, I cannot accept the Majority's approval of the Modified Regional Plan, which splits election districts in violation of Section 303(b)(3) of the Public School Code of 1949 (School Code).[2] The School Code provides as follows, in relevant part:

---

[1] U.S. Const. amend. XIV, § 1.

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 3-303(b)(3).

(a) In each school district of the second class, and on and after July 1, 1966, or if there is advance establishment July 1, 1964, or July 1, 1965, as the case may be, in each school district of the second, third and fourth class, there shall be a board of nine (9) school directors, who, except as otherwise provided in this act, **shall be elected at large** for terms of six (6) years.  The terms of three of the members shall expire on the first Monday of December of each odd numbered year, as now provided by law.  At each municipal election, three school directors, except as otherwise provided in this act, shall be elected at large for terms of six (6) years.  Their terms of office shall begin on the first Monday of December following their election.  Beginning with the terms to be filled at the municipal election held in 1979 and each odd numbered year thereafter, the terms of school directors so elected shall be four (4) years, except that at the municipal election in 1983, five (5) school directors shall be elected for terms of four (4) years and one (1) for a term of two (2) years.  At the municipal election in 1985 and every four (4) years thereafter, four (4) directors shall be elected for terms of four (4) years.  At the municipal election in 1987 and every four (4) years thereafter, five (5) directors shall be elected for terms of four (4) years. The board shall select by lot, prior to the time for filing of nomination petitions, the vacancy that is to be filled for a two (2) year term in 1983.

(b)(1) The interim operating committee or the board of school directors **may develop a plan to elect school directors from regions or to elect some school directors at large and some from regions**.  Such a plan may also be developed by the resident electors of a school district as provided herein and shall have the same effect as one developed by the board of school directors.

. . . .

(3) **The boundaries of the regions shall be fixed and established in such manner that the population of each region shall be as nearly equal as possible and shall be compatible with the boundaries of election districts**.  Such plan for the division of the school district shall be submitted for approval to the court of common pleas.  If approved by such court, the clerk thereof shall certify the regional boundaries contained therein to the county board of elections.  **In the event of any division, redivision, alteration, change or consolidation of election districts which renders regional boundaries incompatible with the boundaries of election districts, a new plan shall be developed and submitted for court approval in like manner**.  Any proposed change in an approved plan, including abolition of regional representation,

shall be submitted for approval to the court of common pleas by the board of school directors, or by a petition of the resident electors within the district. Where a region plan is approved, school directors who reside in each region shall be elected by and from each region. At all times each region shall be represented by directors elected or appointed from that region. Where a combination at large and region plan is approved, all regions shall have an equal number of school directors who reside in each region and who shall be elected or appointed by and from each region. At all times each region shall be represented by a director or directors elected or appointed from that region. All plans shall provide that three school directors shall be elected at each municipal election. In a combination at large and region plan, the number of regions shall be three. In a region plan not combining at large directors, the number of regions shall be three or nine.

24 P.S. § 3-303(a)-(b)(1), (3) (emphasis added).

My reasoning is generally consistent with Judge Fizzano Cannon's concurring and dissenting opinion. Section 303(a) requires an at-large plan for electing school board directors. Section 303(b)(3) allows for a regional plan only if it meets certain requirements and receives approval from the court of common pleas. One of these requirements is that regions in the plan must be "compatible with the boundaries of election districts." 24 P.S. § 3-303(b)(3). The plain meaning of this "compatibility" requirement is that an election district must not be "split" between regions. This is consistent with language appearing later in Section 303(b)(3), recognizing that "any division, redivision, alteration, change or consolidation of election districts" might render regional boundaries incompatible.[3] *Id.*

Under the Majority's interpretation, a school district region may split election districts as much as "absolutely necessary to ensure constitutional compliance," so

---

[3] Significantly, this is also consistent with Section 502 of the Pennsylvania Election Code, which requires that newly created election districts be "wholly contained within any larger district from which any . . . school district officers are elected." Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2702.

long as doing so is administratively feasible. *See In re: River Valley Sch. Dist.*, ___ A.3d ___ (Pa. Cmwlth., No. 136 C.D. 2023, filed Dec. 17, 2024), slip op. at 34-37 (Maj. Op.). This interpretation stretches the language of Section 303(b)(3) too far. If our General Assembly intended to create such a standard, it could have, and would have, said so more clearly. Further, the Majority's resort to dictionary definitions is unpersuasive. School district regions are not "in harmony" with the boundaries of election districts if they violate those boundaries and break districts apart.[4]

This leaves the At-Large Plan, which is the only option that complies with the Equal Protection Clause's "one person, one vote" principle and Section 303(b)(3)'s compatibility requirement. The Majority contends its interpretation of "compatible" furthers the General Assembly's goal of promoting regional representation, avoids constitutional difficulties, and is necessary under the "compelling circumstances" of the case. *In re: River Valley Sch. Dist.*, ___ A.3d at ___, Maj. Op. at 33-39. This argument fails to acknowledge the reality that our General Assembly chose to make an at-large plan the default method of electing school board directors, which poses no constitutional difficulties and eliminates any "compelling" need to split election districts.

If the At-Large Plan were not available, I would agree with the need to explore a more flexible definition of compatibility in the interest of protecting the rights of the District's residents. However, because the General Assembly already included a constitutional alternative in the School Code, and provided a statutory scheme that

___

[4] I am not, of course, suggesting that courts cannot use dictionaries when determining the meaning of a statute. *See In re: River Valley Sch. Dist.*, ___ A.3d at ___, Maj. Op. at 38 n.27. My concern is that the dictionary definition of "compatible" on which the Majority relies does not support its reading of the School Code. It would not have made sense for the General Assembly to use a word like "coextensive" or "identical" because a school district region can include numerous election districts. In that scenario, the school district region is "compatible with the boundaries of election districts" it contains, but it is not "coextensive" with or "identical" to those boundaries.

expressly favors that alternative over a regional plan, there is no need to perform the analysis the Majority undertakes. Importantly, the District's expert witness, David Wassel, prepared a report and testified the At-Large Plan was preferable to the Status Quo Plan. Reproduced Record at 15-16, 135-36. The Court of Common Pleas of Indiana County (common pleas) approved the At-Large Plan in the alternative:

> [The District] sets forth a compelling argument in support of an At-Large [P]lan. Particularly persuasive is the argument that an At-Large [P]lan would mitigate the conflict that appears to remain within the [D]istrict. Specifically, it would require those seeking the office of school director to campaign throughout the [D]istrict providing an opportunity to learn, understand and when appropriate, advocate for all electors. This incentive is not present in the Status Quo Plan or the Proposed Modified Regional Plan. A director under the Status Quo Plan or the Modified Regional Plan only needs to campaign in the region where he or she is seeking election, negating contact and the opportunity to hear from electors in other regions. As so succinctly stated in [the District's] Brief[:] "[The District] does not need board members from a Blairsville faction . . . [and] does not need members from a Saltsburg faction. What it needs are [District] Board Members." The implementation of an At-Large system would also negate the difficulties relating to the fluctuations in population and the difficulties defining regions that comply with the Constitutionally required one man, one vote requirement as embodied in [Section 303].

> . . . .

> Assuming arguendo, that this Court had found that the Status Quo Plan meets the requirements of [Section 303], after consideration of the same factors as set forth above and the significant reduction in population deviations in the Modified Regional Plan, this Court finds that the Proposed Modified Regional Plan better achieves the requirements of [the District]. Additionally, **if this Court were to find the Status Quo Plan meets the requirements of [Section 303] and the Court did not have the option to consider the Proposed Modified Regional Plan**, due to the current population deviations, the projected future population changes, the difficulties in drawing regions that are compatible with election districts, and in consideration of the

SW - 5

factors as discussed above, **this Court would approve the implementation of the At-Large [P]lan**.

Trial Ct. Op., 1/27/23, at 12-14.

Judge Fizzano Cannon maintains in her concurring and dissenting opinion that common pleas approved the At-Large Plan based on "the erroneous assumption that the Status Quo Plan violates the School Code and/or constitutional voting equality requirements." *In re: River Valley Sch. Dist.*, ___ A.3d ___ (Pa. Cmwlth., No. 136 C.D. 2023, filed Dec. 17, 2024), slip op. at 23 (Fizzano Cannon, J., concurring and dissenting). I agree with the Majority's determination that the Status Quo Plan violates the Equal Protection Clause's "one person, one vote" principle. Therefore, common pleas did not make any erroneous assumption in this regard. It is important to add, as the Majority notes, that common pleas deemed the At-Large Plan preferable to the Status Quo Plan even assuming the Status Quo Plan does not violate Section 303.

For these reasons, I agree with the Majority and would affirm common pleas to the extent it set aside the Status Quo Plan. I agree with Judge Fizzano Cannon's concurring and dissenting opinion and would reverse to the extent common pleas adopted the Modified Regional Plan. Finally, I would remand for entry of an order adopting the At-Large Plan, which complies with both constitutional mandates and the language of the School Code.

_____
STACY WALLACE, Judge

SW - 6